# United States Court of Appeals

*for the*

# Third Circuit

Case Nos. 22-1417, 22-1484

LONTEX CORP,

*Plaintiff-Appellee-Cross-Appellant,*

– v. –

NIKE INC,

*Defendant-Appellant-Cross-Appellee.*

ON APPEAL FROM AN ORDER OF THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA, CASE NO. 2-18-CV-05623
HONORABLE MICHAEL M. BAYLSON

## REPLY BRIEF FOR DEFENDANT-APPELLANT-CROSS-APPELLEE

MARC E. MILLER
DLA PIPER LLP (US)
1251 Avenue of the Americas
New York, New York 10020
(212) 335-4500
marc.miller@dlapiper.com

GINA L. DURHAM
DLA PIPER LLP (US)
555 Mission Street, Suite 2400
San Francisco, California 94105
(415) 836-2500
gina.durham@dlapiper.com

ILANA H. EISENSTEIN
BEN C. FABENS-LASSEN
DLA PIPER LLP (US)
1650 Market Street
One Liberty Place, Suite 5000
Philadelphia, Pennsylvania 19103
(215) 656-3300
ilana.eisenstein@dlapiper.com
ben.fabens-lassen@dlapiper.com

STANLEY J. PANIKOWSKI
DLA PIPER LLP (US)
401 B Street, Suite 1700
San Diego, California 92101
(619) 699-2700
stanley.panikowski@dlapiper.com

*Attorneys for Defendant-Appellant-Cross-Appellee Nike Inc*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 and Third Circuit LAR 26.1, Appellant/Cross-Appellee

NIKE, Inc. makes the following disclosure:

I.     For non-governmental corporate parties please list all parent

corporations:

**NIKE, Inc. has no parent corporation.**

II.     For non-governmental corporate parties please list all publicly held

companies that hold 10% or more of the party's stock:

**No publicly held company holds 10% or more of NIKE, Inc.'s stock.**

III.     If there is a publicly held corporation which is not a party to the

proceeding before this Court but which has as a financial interest in the outcome of

the proceeding, please identify all such parties and specify the nature of the

financial interest or interests:

**NIKE is not aware of any publicly held corporation that is not a party
to this case that has a financial interest in the outcome of this
proceeding.**

IV.     In all bankruptcy appeals counsel for the debtor or trustee of the

bankruptcy estate must list: 1) the debtor, if not identified in the case caption;

2) the members of the creditors' committee or the top 20 unsecured creditors; and,

3) any entity not named in the caption which is an active participant in the

bankruptcy proceeding. If the debtor or trustee is not participating in the appeal,

this information must be provided by appellant.  **N/A**

Dated:  January 13, 2023

*/s/ Ilana H. Eisenstein*

Ilana H. Eisenstein
DLA PIPER LLP (US)
One Liberty Place
1650 Market Street, Suite 5000
Philadelphia, PA 19103-7300
Tel: 215.656.3300

*Counsel for Appellant/Cross-Appellee NIKE, Inc.*

# TABLE OF CONTENTS

**Page**

I.     STATEMENT OF THE ISSUES ..................................................................1

II.    SUMMARY OF ARGUMENT .................................................................1

III.   REPLY ARGUMENT IN SUPPORT OF NIKE'S APPEAL ......................3

     A.    Lontex Fails to Show a Reasonable Basis for Rejecting NIKE's Fair Use Defense ..........................................................................3

     B.    Lontex Fails to Show a Reasonable Basis for Finding Likelihood of Confusion .......................................................8

     C.    Lontex Identifies No Substantial Evidence Supporting Contributory Infringement .................................................12

     D.    Lontex Fails to Justify the Legally Flawed and Factually Unsupported Willfulness Finding ....................................13

     E.    The Record Contradicts Lontex's Defense of Enhanced and Punitive Damages..............................................................18

     F.    Lontex Cannot Justify the Legal Errors on Which the District Court's Exceptional Case Ruling and Fee Award Are Premised ......21

          1.    Lontex Largely Ignores the "Unreasonable Manner" Factor and the District Court's Findings Against It..................21

          2.    The District Court Did Not Find Any "Unusual Discrepancy" Between the Merits of the Parties' Positions, and Lontex Identifies None .....................................23

          3.    Lontex's Remaining Arguments Lack Merit ...........................25

IV.   ARGUMENT IN RESPONSE TO LONTEX'S CROSS-APPEAL ............28

     A.    The District Court Properly Exercised Its Discretion in Denying Disgorgement o/f Profits ...................................................28

          1.    The District Court Permissibly Consulted the Jury's Verdict in Making Its Own Ruling on Disgorgement .............29

a.      The District Court Made Independent Written
        Findings ..........................................................................30

b.      The District Court Also Had Discretion to Accept
        the Jury's Findings on Disgorgement.............................32

c.      Any Error Was Invited by Lontex and Thus
        Cannot Be a Basis for Relief .........................................33

2.   The District Court Properly Declined to Award
     Disgorgement...............................................................................35

a.      Lontex's Request that This Court Order
        Disgorgement "as a Matter of Law" Contradicts
        Precedent.........................................................................36

b.      The *Banjo Buddies* Factors Weigh Strongly
        Against Disgorgement ....................................................39

c.      Lontex's Request that This Court Establish a Floor
        for Disgorgement Is Legally and Factually
        Unsupported.....................................................................44

B.   Lontex's Counterfeiting Claims Fail as a Matter of Law and
     Were Properly Dismissed at the Pleading Stage ................................49

1.   The District Court's Dismissal Order .......................................49

2.   Counterfeiting Requires the Use of a Mark that Is Both
     "Spurious" and "Identical with, or Substantially
     Indistinguishable from, a Registered Mark"..............................50

3.   Lontex's First Amended Complaint Lacked Any Factual
     Allegations that Could Plausibly Support Its
     Counterfeiting Claims ................................................................52

V.   CONCLUSION...........................................................................................59

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*4 Pillar Dynasty LLC v. N.Y. & Co.*,
    933 F.3d 202 (2d Cir. 2019) ...............................................................48

*A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*,
    166 F.3d 197 (3d Cir. 1999) .................................................29, 36, 42

*A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*,
    237 F.3d 198 (3d Cir. 2000) ......................................................8, 9, 14

*Associated Gen. Contractors of Am. v. Stokes*,
    2013 WL 1155512 (E.D. Va. Mar, 19, 2013)....................................54

*Astrazeneca AB v. Dr. Reddy's Labs., Inc.*,
    209 F. Supp. 3d 744 (D. Del. 2016).................................................51

*Audemars Piguet Holding S.A. v. Swiss Watch Int'l, Inc.*,
    2015 WL 150756 (S.D.N.Y. Jan. 12, 2015) ................................52, 55

*Banjo Buddies, Inc. v. Renosky*,
    399 F.3d 168 (3d Cir. 2005) ......................................................*passim*

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007)............................................................................53

*Cohen & Co., Ltd. v. Cohen & Co. Inc.*,
    2022 WL 5250271 (E.D. Pa. Oct. 6, 2022) ................................52, 55

*Consolidated Edison Co. v. NLRB*,
    305 U.S. 197 (1938)..............................................................................4

*Coty Inc. v. Excell Brands, LLC*,
    277 F. Supp. 3d 425 (S.D.N.Y. 2017) ........................................24, 57

*Covertech Fabricating, Inc. v. TVM Bldg. Prods., Inc.*,
    855 F.3d 163 (3d Cir. 2017) ...................................30, 36, 47, 48

*CPC Props., Inc. v. Dominic, Inc.*,
    2013 WL 5567584 (E.D. Pa. Oct. 9, 2013) ......................................44

*Electro Sci. Indus., Inc. v. Gen. Scanning Inc.*,
  247 F.3d 1341 (Fed. Cir. 2001) .......................................................... 40

*Excelled Sheepskin & Leather Coat Corp. v. Oregon Brewing Co.*,
  2015 WL 4468083 (S.D.N.Y. July 8, 2015) ....................................... 51

*Fair Wind Sailing, Inc. v. Dempster*,
  764 F.3d 303 (3d Cir. 2014) ................................................. 21, 23, 24

*Fisons Horticulture, Inc. v. Vigoro Indus., Inc.*,
  30 F.3d 466 (3d Cir. 1994) ............................................................ 13, 14

*Fleck v. KDI Sylvan Pools, Inc.*,
  981 F.2d 107 (3d Cir. 1992) ................................................................ 35

*Fogerty v. Fantasy, Inc.*,
  510 U.S. 517 (1994) ............................................................................. 27

*Freedom Card, Inc. v. JPMorgan Chase & Co.*,
  432 F.3d 463 (3d Cir. 2005) ......................................................... 10, 14

*Fujifilm N. Am. Corp. v. PLR IP Holdings, LLC*,
  2019 WL 274967 (S.D.N.Y. Jan. 7, 2019) ........................................ 52

*Gibson Brands, Inc. v. John Hornby Skewes & Co.*,
  2016 WL 7479317 (C.D. Cal. Dec. 29, 2016) .................................... 54

*GMA Accessories, Inc. v. BOP, LLC*,
  765 F. Supp. 2d 457 (S.D.N.Y. 2011) ............................................... 55

*Green v. Fornario*,
  486 F.3d 100 (3d Cir. 2007) ............................................................... 16

*Greenwood v. Greenwood*,
  234 F.2d 276 (3d Cir. 1956) ............................................................... 33

*Gucci Am., Inc. v. Daffy's Inc.*,
  354 F.3d 228 (3d Cir. 2003) ......................................................... 41, 46

*Gucci Am., Inc. v. Guess?, Inc.*,
  868 F. Supp. 2d 207 (S.D.N.Y. 2012) ............................................... 51

*Hayes v. Community Gen. Osteopathic Hosp.*,
  940 F.2d 54 (3d Cir. 1991) .....................................................30, 32, 33

*Holland v. Florida*,
  560 U.S. 631 (2010)............................................................................41

*Inwood Labs., Inc. v. Ives Labs., Inc.*,
  456 U.S. 844 (1982)............................................................................12

*Kars 4 Kids Inc. v. American Can!*,
  8 F.4th 209 (3d Cir. 2021) ..............................................................39

*Kelly-Brown v. Winfrey*,
  717 F.3d 295 (2d Cir. 2013) ...........................................................54

*Koninkijke Philips Electronics N.V. v. Hunt Control Sys., Inc*,
  2016 WL 3545529 (D.N.J. June 29, 2016)......................................48

*Kos Pharms., Inc. v. Andrx Corp.*,
  369 F.3d 700 (3d Cir. 2004) ......................................................15, 16

*Lima v. Newark Police Dep't*,
  658 F.3d 324 (3d Cir. 2011) ...........................................................33

*Louis Vuitton Malletier & Oakley, Inc. v. Veit*,
  211 F. Supp. 2d 567 (E.D. Pa. 2002)...............................................49

*Marshak v. Treadwell*,
  595 F.3d 478 (3d Cir. 2009) ......................................................38, 39

*Max Rack, Inc. v. Core Health & Fitness, LLC*,
  40 F.4th 454 (6th Cir. 2022) ...........................................................24

*Northern Lights Tech., Inc. v. Northern Lights Club*,
  236 F.3d 57 (1st Cir. 2001)........................................................16, 17

*Octane Fitness, LLC v. ICON Health & Fitness, Inc.*,
  572 U.S. 545 (2014)....................................................................*passim*

*Quick Techs., Inc. v. Sage Group PLC*,
  313 F.3d 338 (5th Cir. 2002) ...........................................................46

*Robinson v. First State Cmty. Action Agency*,
  920 F.3d 182 (3d Cir. 2019) ...............................................35

*Romag Fasteners, Inc. v. Fossil, Inc.*,
  140 S. Ct. 1492 (2020)........................................................40

*Sabinsa Corp. v. Creative Compounds, LLC*,
  609 F.3d 175 (3d Cir. 2010) ...............................................12

*Safeway Transit LLC v. Discount Party Bus, Inc.*,
  954 F.3d 1171 (8th Cir. 2020) ............................................46

*SecuraComm Consulting Inc. v. Securacom Inc.*,
  166 F.3d 182 (3d Cir. 1999) ..........................................13, 14

*Stone Creek v. Omnia Italian Design, Inc.*,
  808 F. App'x 460-61 (9th Cir. 2020)...................................46

*Stryker Corp. v. Zimmer Inc.*,
  837 F.3d 1268 (Fed. Cir. 2016) ..........................................24

*Tovey v. NIKE, Inc.*,
  2013 WL 486341 (N.D. Ohio Feb. 6, 2013).........................55

*United States v. Chong Lam*,
  677 F.3d 190 (4th Cir. 2012) .........................................51, 52

*United States v. W. Indies Transp., Inc.*,
  127 F.3d 299 (3d Cir. 1997) ...............................................35

*W.E. Bassett Co. v. Revlon Inc.*,
  435 F.2d 656 (2d Cir. 1970) ..........................................38, 39

*Western Diversified Servs., Inc. v. Hyundai Motor Am., Inc.*,
  427 F.3d 1269 (10th Cir. 2005) .....................................40, 44

**Statutes**

15 U.S.C. § 1117(a) ...............................................................18, 26, 29, 36

15 U.S.C. § 1127...................................................................50, 51, 52


**Other Authorities**

BLACK'S LAW DICTIONARY (9th ed. 2009) ................................................33

BLACK'S LAW DICTIONARY (11th ed. 2019) .........................................50

Fed. R. Civ. P. 39 ..................................................................................32

Fed. R. Civ. P. 39(c)(1)........................................................................30

1 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 2:22
    (5th ed. 2021)..................................................................................43

4 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 23:120
    (5th ed. 2021)..................................................................................17

4 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 25:10
    (5th ed. 2021).............................................................................51, 59

4 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 25:15.50
    (5th ed. 2021)..................................................................................53

## I.    STATEMENT OF THE ISSUES

The issues in NIKE's appeal are stated at page 4 of its opening brief.

The issues in Lontex's cross-appeal are:

1.    Did the district court reasonably decline to award disgorgement of NIKE's profits to Lontex, consistent with both the jury verdict and its own analysis of this Court's *Banjo Buddies* factors?

2.    Did the district court correctly dismiss Lontex's claims for counterfeiting—the most blatant and egregious form of "passing off"—based on the use of "cool compression" in textual style names for NIKE PRO products?

## II.    SUMMARY OF ARGUMENT

Like its presentation at trial, Lontex's appeal brief is long on emotional rhetoric and short on substantial evidence to support the liability verdict. That verdict cannot withstand the overwhelming evidence that any appearance of "cool compression" in NIKE PRO style names was the result of a good-faith effort to describe features of NIKE products without using that phrase as a trademark.

Lontex does not and cannot dispute that "cool compression" never appeared on a NIKE product; never appeared on a NIKE label, hangtag, or package; and never was used in an advertising or marketing campaign. Lontex instead relies almost entirely on the inconsistent appearance of the two words next to each other in certain NIKE style names that consumers sometimes encountered online.

- 1 -

Viewing this issue in light of the record as a whole, including the unrefuted testimony of NIKE employees explaining how and why the style names were created and used, NIKE's use was fair as a matter of law. Many of these same facts inform the conclusion that no fact-finder could reasonably infer a likelihood of confusion from this record. Lontex fails to overcome either of these independent bases for reversing the judgment.

Lontex's arguments on willfulness and remedies fare no better, including its cross-appeal challenge to the discretionary denial of any disgorgement of NIKE's profits. Even if liability stands, both the district court and jury reasonably found no disgorgement was warranted under this Court's six-factor *Banjo Buddies* test. Finally, Lontex's attempt to revive its implausible claims of "counterfeiting" fails too. At most, Lontex alleged only garden-variety trademark infringement, and nothing remotely approaching the much stricter standard for counterfeiting.

The liability judgment and all remedies and fees awarded should be reversed. But if liability survives, the only remedies that should remain are the jury's compensatory damages award and district court's injunction that were not independently challenged on appeal.

### III.    REPLY ARGUMENT IN SUPPORT OF NIKE'S APPEAL

#### A.    Lontex Fails to Show a Reasonable Basis for Rejecting NIKE's Fair Use Defense

As shown in NIKE's opening brief (at 20-30), its accused use was fair use as a matter of law.  Lontex's erroneous arguments and overheated rhetoric cannot rebut that conclusion.

**<u>Non-Trademark Use</u>**.  The essence of Lontex's argument on trademark use is its flawed contention that "Nike used the term 'Cool Compression' in product names *exactly* as Lontex did—to brand the particular products and technology within its high-performance line of athletic wear [internal citation]—and *exactly* how Nike used its trademarks, such as 'Nike Pro Hyperwarm,' 'Nike Pro Hypercool,' and 'Nike Dri-FIT.'"  (Lontex Brief ("LB") 31 (citing LB 7, 10-19).)  The record decisively shows otherwise.

Unlike NIKE's actual trademarks, NIKE never used "cool compression":

- On products themselves

- On product labels

- On product hangtags

- On product packaging

- In advertising and marketing campaigns

- In a consistent manner

- 3 -

- In an attempt to clear it as a trademark

- In an attempt to register it as a trademark

- In an attempt to develop a brand or product franchise

(*See* Nike Opening Brief ("NIKE Br.") 22-25.)

These facts are undisputed. To the extent the district court referred to "cool compression" appearing on any NIKE labeling (A19, A23, A29), it cited no evidence for that assertion, and none exists. Rather, as Lontex agreed at trial and does not contest on appeal, there is no evidence that NIKE used "cool compression" on any labels. (A2016-17, 9T 194:21–195:21.)

NIKE also never used "cool compression" in retail store displays or promotions. (A1126, 5T 67:17-18; A1151, 5T 92:2-9; A1306, 6T 72:2-16.) Despite having a team of lawyers and support staff working to build evidence for this case as early as 2016 (A865, 4T 66:10-17), Lontex never produced any concrete evidence showing otherwise. The vague and anecdotal bits of testimony on which Lontex relies for this point (*e.g.*, LB 32) are a "mere scintilla" of evidence, not substantial evidence supporting the verdict. *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938).

Lontex's heavy reliance on the deposition testimony of NIKE senior director Deb White further belies the weakness of its position. (LB 7, 33.) Ms. White never testified that NIKE used "cool compression" as a trademark. Rather, she

testified that she had "never ascribed a particular importance to the term 'cool' adjacent to 'compression,'" and that she "generally know[s] that we would use 'cool' as an adjective and 'compression' as a noun describing products, but 'Cool Compression' is not a thing together." (A2437.)

The testimony that Lontex repeatedly cites was in response to the follow-up question, "Is there any reason that you can think of why in 2015 to 2017, as you're looking at training materials that are coming across your desk, seeing 'cool' adjacent to 'compression' would have stood out to you more so than seeing 'cool' somewhere and 'compression' somewhere else?" (A2438.) Ms. White answered, "I mean, 'Cool Compression' together sounds like it's a thing, like it's almost hyphenated, becoming a noun in and of itself. That would – I would think that would stand out to me like 'Dri-FIT.' Dry is an adjective. Fit is a noun. Dri-FIT together becomes a thing." (A2438.) Ms. White was therefore explaining why, in reviewing the actual NIKE training materials, "'Cool Compression' is 'not a thing together'" (A2437)—thus undermining Lontex's assertion of trademark use—not that NIKE used "cool compression" as a trademark or that any consumers understood its appearance within NIKE style names that way.

Moreover, saying that something could be "a thing, like it's almost hyphenated, becoming a noun in and of itself" does not amount to saying it actually functions as a trademark in the marketplace. Rather, as shown above and

in NIKE's opening brief (at 22-24), the most common indicia of trademark use—
which were present with respect to marks like NIKE, NIKE PRO, and Dri-FIT—
were strikingly absent with respect to the term "cool compression."

**Descriptive Use.**  Lontex's argument on descriptive use repeats its false
equivalence between how NIKE used "cool compression" and how NIKE used its
actual trademarks.  (LB 34-35.)  Lontex also has no legitimate basis for its
assertion that "in 'Cool Compression,' 'cool' is an adjective that would have to
modify 'compression.'"  (LB 35.)  Rather, in the accused style names,
"compression" was almost always followed by a generic product category like
"short" or "short-sleeve top."  (*See* NIKE Br. 25-27.)  It is thus clear that the words
"cool" and "compression" each described features of the garment, including its
temperature control properties ("cool" versus "warm") and the tightness of its fit
("compression" versus "fitted").

Finally, Mr. Nathan himself stated in March 2016 that NIKE was "just using
[COOL COMPRESSION] to describe this 'Pro Lite Compression Apparel'
online."  (A2545, DX283.)  Lontex now curiously argues the jury was entitled to
believe this contemporaneous email was a lie.  (LB 36.)  Yet Mr. Nathan's own
pre-litigation assessment aligns with the objective evidence of NIKE's descriptive
use.  (NIKE Br. 25-27.)  Lontex's subsequent litigation contentions do not.

**Good Faith.**  Lontex also fails to rebut NIKE's conclusive showing of good faith.  Rather, Lontex relies mostly on the same accusations, unsupported by actual evidence, with which it relentlessly pounded the jury and district court at trial.  For example, Lontex falsely asserts that Nike "***fully knew that it was violating Lontex's rights***."  (LB 37.)  Then, completely without evidentiary citation or support, Lontex proclaims: "That Nike acted in this brazen manner can only be explained by the fact that Lontex is small, and Nike arrogantly concluded that Lontex would not have the ability to enforce its mark."  (LB 37.)  Lontex's unfounded smears are no substitute for substantial evidence in the record.  If anything, they are indicative of its absence.

As NIKE showed in its opening brief (at 27-30), the record evidence negates the required intent to confuse.  Lontex's conclusory assertion that such evidence existed lacks record support.  (LB 39.)  Lontex simply hammered the two legally insufficient facts that NIKE (1) did not perform a trademark search on "cool compression" and (2) did not immediately halt all challenged uses in response to a cease-and-desist letter with which it did not agree.  (A1523, 7T 32:9-15.)  NIKE established fair use as a matter of law, and the district court's denial of JMOL should be reversed.

**B.      Lontex Fails to Show a Reasonable Basis for Finding Likelihood of Confusion**

Lontex's likelihood of confusion arguments rest on legal and factual errors. As NIKE explained in its opening brief (at 31-44), JMOL is warranted on this ground too.

*Lapp* **Factor 1: Similarity of Marks.**  Lontex's argument contradicts this Court's emphasis on "the importance of housemarks in comparing the 'overall impression' of two marks." *A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 237 F.3d 198, 216 (3d Cir. 2000).  Lontex gives no sensible reason why a reasonable consumer who sees the words "cool compression" in a NIKE PRO style name is likely to think it refers to a Lontex product, as opposed to features of NIKE's own products.  Lontex cannot escape this bind by recharacterizing "cool compression" as a "technology trademark" (LB 42), especially given the evidence that Lontex actually deployed third-party trademarks like COOLMAX® to refer to the technology it used in its products.  (A2685, DX915 at 1; A502, 2T 82:1-10.) Lontex also incorrectly asserts that NIKE used the term "to denote a technology/product line within its broader brand or housemark," when the unrefuted evidence showed NIKE did no such thing. (LB 41-42; NIKE Br. 22-25, 31-34.)

Nor can Lontex hide behind reverse confusion to avoid the stark differentiation achieved by the parties' house marks.  (LB 40-43.)  While Lontex advocates a presumption that house marks aggravate reverse confusion (LB 42), this Court has held it is a "possibility" that depends on the circumstances. *A & H Sportswear*, 237 F.3d at 229-30.

Lontex further errs by comparing NIKE's use of the mark to its standard-character registration, instead of Lontex's actual marketplace use. *See id.* at 216.

***Lapp* Factor 2: Strength of Mark.**  In arguing strength of mark, Lontex undermines its assertion that NIKE used "cool compression" as a trademark. Lontex states that placement on a product's tag is how companies promote marks like "cool compression."  (LB 44-45.)  But it is undisputed that NIKE *never* placed "cool compression" on a product, label, or anything else that was physically associated with the product.  (NIKE Br. 8, 22.)  Because Lontex must prevail on *both* likelihood of confusion and fair use, it cannot have it both ways.

Lontex also mischaracterizes Ms. White's testimony when it claims she "noted" that "the combination of these two words [cool and compression] into a single concept became 'more than just an adjective and a noun,' 'becoming a noun in and of itself' that 'stand[s] out.'"  (LB 45 (quoting A2438) (alteration in original).)  Ms. White's testimony did not pertain to Lontex's use of "cool compression" in the marketplace at all.  (A2438.)

Lontex also incorrectly downplays the descriptive nature of "cool compression" in the context of performance garments that were designed to keep the wearer "cool" while providing a tight "compression" fit. (LB 45.) While the combination of two descriptive words is of course capable of achieving trademark significance, the combination itself may still be—as the record showed here—conceptually weak as used in the marketplace.

Lontex also falsely asserts that NIKE's accurate citation of Lontex's sales volumes (NIKE Br. 36) amounts to "denigration of Lontex's sales." (LB 46.) Those sales volumes show commercial weakness under this Court's precedent. *See Freedom Card, Inc. v. JPMorgan Chase & Co.*, 432 F.3d 463, 472-73 (3d Cir. 2005). (LB 46.) Lontex's unwarranted characterization of NIKE's citation as "the arrogance that led to its willful and bad faith trademark infringement" is just another example of Lontex's efforts to fill an evidentiary void with unsubstantiated rhetoric. Similarly, Lontex's assertion that NIKE's "infiltration was total" ignores the undisputed facts that Nike never used "cool compression" on products, labels, hangtags, or packaging, nor in any advertising or marketing campaign. (LB 46.)

**_Lapp_ Factor 3: Degree of Consumer Care.** Lontex tries to recast its specialty athletic performance apparel, sold primarily to a niche audience, as general consumer goods. (LB 47-48.) But the record shows otherwise. (NIKE Br. 39-40.) Lontex also mischaracterizes NIKE's argument by replacing the word

"primarily" with "only" before quoting NIKE's opening brief. (*Compare* LB 48 ("Nike erroneously contends that Lontex sold its products only to 'a niche of sophisticated professionals in the sports medicine field,' at a high price."), *with* NIKE Br. 39 ("As noted above, Lontex sold its garments primarily to a niche of sophisticated professionals in the sports medicine field: physicians, physical therapists, athletic trainers for professional and collegiate sports teams.").) Lontex also ignores the care exercised by purchasers of garments that Lontex marketed specifically for their therapeutic benefits. (*Compare* LB 47-48, *with* NIKE Br. 39-40.)

*Lapp* **Factors 4 & 6: Actual Confusion.** Lontex's argument overlooks the extensive testimony from its own witnesses undermining its assertions of actual confusion. (*Compare* LB 48-50, *with* NIKE Br. 40-42.) Lontex also fails to square its hyperbolic assertions of NIKE's supposed "flooding" of the market with "cool compression" with the paucity of evidence of actual confusion.

*Lapp* **Factor 5: Intent.** Lontex identifies no evidence of intent that could possibly meet this Court's legal standard: "courts must look at whether the defendant chose the mark to intentionally confuse consumers," and a "defendant's intent will indicate a likelihood of confusion only if an intent to confuse consumers is demonstrated via purposeful manipulation of the junior mark to resemble the senior's." *Sabinsa Corp. v. Creative Compounds, LLC*, 609 F.3d 175, 187 (3d Cir.

2010) (citations and quotations omitted).  The record instead makes clear that NIKE had no such intent.  (*See* NIKE Br. 43.)

**_Lapp_ Factors 7-10: Similarity of Goods, Channels, Target Consumers, Etc.**  Lontex's argument glosses over the important differences in the nature of the parties' goods, sales and marketing channels, and target consumers.  (*Compare* LB 50-53, *with* NIKE Br. 37-39.)

Viewing the whole trial record, it is unreasonable to conclude there was a likelihood of confusion.

### C.    Lontex Identifies No Substantial Evidence Supporting Contributory Infringement

Contrary to Lontex's assertion, there was no evidence that NIKE "intentionally induced its retailers to infringe" or that NIKE "knew or should have known [the retailers] would infringe." (LB 53-54.)  Without such evidence, there can be no contributory infringement.  *See Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 853-54 (1982).  And though it was not NIKE's burden, the evidence in fact showed that NIKE believed the challenged uses were merely descriptive and hence permissible.  (*See* NIKE Br. 8-13, 22-27.)

**D.    Lontex Fails to Justify the Legally Flawed and Factually Unsupported Willfulness Finding**

**Legally Erroneous Jury Instruction.**  Lontex's attempt to justify the

district court's erroneous willfulness instruction fails for several reasons.

First, Lontex ignores that its willfulness theory depended entirely on the lack

of a trademark search and the lack of immediate cessation after receiving a cease-

and-desist letter.  (A1519-21 7T 28:4–30:17.)  That is why NIKE's opening brief

(at 48-49) calls out those portions of the instruction that wrongly allowed the jury

to infer willfulness from precisely those facts.  (*Contra* LB 56.)  Because Lontex

confined itself to arguments that could succeed only under the erroneous parts of

the willfulness instruction, the other portions of that instruction cannot save the

verdict.  *See SecuraComm Consulting Inc. v. Securacom Inc.*, 166 F.3d 182, 189

(3d Cir. 1999) (holding that "failure to conduct a trademark search is insufficient to

establish that its infringement was willful or intentional" and that failure to stop

use after receiving a cease-and-desist letter "does not demonstrate willful

infringement").

Second, Lontex repeatedly relies on *Fisons* for the notion that being merely

"'careless in not conducting a thorough name search'" is enough for willfulness in

a reverse confusion case.  (LB 54-56, 58 (quoting *Fisons Horticulture, Inc. v.

Vigoro Indus., Inc.*, 30 F.3d 466, 480 (3d Cir. 1994)).)  But this Court later

- 13 -

expressly rejected any interpretation of *Fisons* as holding that "mere carelessness, as opposed to deliberate intent to confuse, would weigh in a plaintiff's favor in a reverse confusion case," because such a rule "would be manifestly out of step with our prior holdings regarding the relevance of 'intent' in trademark infringement claims." *A & H Sportswear*, 237 F.3d at 232-33; *see also Freedom Card, Inc. v. JPMorgan Chase & Co.*, 432 F.3d 463, 480 (3d Cir. 2005) (rejecting carelessness standard).

Third, Lontex pays lip service to this Court's rule that willfulness "requires an 'intent to infringe *or a deliberate disregard* of a mark holder's rights,'" but fails to identify any substantial evidence supporting either state of mind.  (LB 54 (quoting *SecuraComm*, 166 F.3d at 187).)  Lontex cites no evidence that could indicate NIKE intended to infringe or deliberately disregarded Lontex's rights. Rather, all the evidence of NIKE's state of mind points in the other direction: (1) NIKE had no knowledge of Lontex's mark before receiving a cease-and-desist letter; (2) NIKE did not perform a trademark search on "cool compression" because it was merely using "cool" and "compression" to describe different features of its NIKE PRO products in their broader style names; and (3) NIKE took steps to address Lontex's concerns even though it continued to believe its use was merely descriptive and hence permissible.  (NIKE Br. 28-30.)

- 14 -

Nor, in denying JMOL, did the district court identify any evidence of an intent to infringe or a deliberate disregard of Lontex's rights. Rather, the court relied on the same two facts—lack of a trademark search and lack of immediate cessation—that were the sum total of Lontex's willfulness case at trial. (A35-36 (cross-referencing A30-31).) In fact, the district court recognized in its analysis of disgorgement that there was no evidence that Nike intended to confuse or deceive anyone. (A21-22.)

Fourth, Lontex inaptly relies on *Kos Pharmaceuticals* to suggest incorrectly that continued use of a mark after notice is enough for willful infringement. (LB 56-58 (citing *Kos Pharms., Inc. v. Andrx Corp.*, 369 F.3d 700, 721-22 (3d Cir. 2004)).) In that case, the defendant made a "deliberate decision to use a name dangerously close to that of a competing drug, with no apparent reason for choosing an arbitrary mark so similar to its competitor's and despite being warned of the confusing similarity." *Kos Pharms.*, 369 F.3d at 725. Here, by contrast, there was indisputably no prior knowledge of the mark and no deliberate decision to use a name dangerously close to that of a competing product. (*See, e.g.*, A1125-26, 5T 66:15–67:16; A1406, 6T 172:17-22; A1171, 5T 112:7-23.) Further, Nike had independent reasons for choosing the words "cool" and "compression" to describe features of its products (NIKE Br. 8-12), and "cool compression" is not even arguably an arbitrary mark like "ALTOCOR" and "ADVICOR." Lontex is

- 15 -

therefore wrong to suggest that *Kos Pharmaceuticals* supports the notion that mere continued use after a demand to stop is enough for willfulness.  (*See* LB 56-57.)

Lontex similarly misconstrues *Green v. Fornario*, 486 F.3d 100 (3d Cir. 2007).  (LB 57.)  In *Fornario*, this Court affirmed a district court's refusal to infer bad faith from the mere failure to act in response to a cease-and-desist letter.  *Id.* at 105.  In doing so, the Court made clear: "In general, putative defendants have every right to decline pre-litigation requests without adverse consequences, but they must do so in good faith—that is, believing that they have a colorable claim of right to engage in the challenged behavior."  *Id.* at 104.  Lontex claims that the Court "approved 'use of defendant's disregard of legitimate cease and desist letters as evidence of bad faith,'" but that language came simply from this Court's parenthetical describing a First Circuit cybersquatting case.  (*Compare* LB 57, *with Fornario*, 486 F.3d at 104.)

The First Circuit case, in turn, concerned the defendants' practice of knowingly incorporating others' trademarks into domain names that it registered and then licensed, "accomplished in some cases by creating fictional 'fan clubs' so that they could present a mantle of legitimacy in their registration requests." *Northern Lights Tech., Inc. v. Northern Lights Club*, 236 F.3d 57, 59, 65 (1st Cir. 2001).  In issuing a preliminary injunction, the district court found a likelihood of bad faith under the Anti-Cybersquatting Protection Act based on "defendants'

historical practice of 'targeting trademarked names, creating fictional entities to register them, and offering dubious explanations for the selection of these domain names.'" *Id.* at 61, 64.  In affirming this finding, the First Circuit also noted: "This conclusion of bad faith was reinforced, according to the district court, by defendants' history of disregarding cease-and-desist letters from legitimate trademark owners, and their apparent openness to sell the northernlight.com registration to the plaintiff at the right price." *Id.* at 65.  Nothing in this decision or *Fornario* itself justifies inferring bad faith from the mere failure to fully comply with a cease-and-desist letter. *See also* 4 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 23:120 (5th ed. 2021) (collecting cases adopting "majority rule" that "[a]n intent to confuse cannot be teased out of a business's decision to continue the challenged use after receiving a cease and desist letter").

Finally, Lontex's circular argument that the punitive damages award rendered harmless any error in the willfulness instruction fails. (LB 59.)  The punitive damages instruction used the term "willful," and thus imported the same errors that rendered the willfulness instruction erroneous. (A2050-51, 9T 228:22–229:3.)  And Lontex's counsel told the jury that the willfulness finding alone was enough to award punitive damages. (A2041, 9T 219:7-11.)

**Lack of Substantial Evidence.**  NIKE showed in its opening brief (at 45-47) why no substantial evidence supported willfulness under either the correct legal standard or the erroneous jury instructions.  Lontex's response is premised on its emotionally charged but evidence-free refrain that NIKE acted "based upon its arrogant belief that Lontex was too small to protect its rights, which Nike knowingly violated."  (LB 60.)  Again, there is simply no evidence that NIKE had or acted because of such a belief.  Nor is there any evidence that NIKE knew that its challenged actions constituted trademark infringement.  Rather, the record shows that NIKE believed the opposite.  No evidence supports Lontex's repeated suggestion that NIKE ignored its own legal counsel's directives, and the testimony it cites actually shows efforts to comply.  (*See, e.g.*, LB 18 (citing A2321-26).)  The willfulness verdict should be reversed even if infringement stands.

### E.    The Record Contradicts Lontex's Defense of Enhanced and Punitive Damages

**Enhanced Damages.**  Lontex admits that compensation is the only permissible purpose for enhanced damages in trademark cases.  (LB 60-61 (citing 15 U.S.C. § 1117(a)).)  But it fails to identify a compensatory rationale in the district court's ruling, much less one the record supports.  (LB 60-63.)  Lontex claims that the district court's enhancement "permissibly addressed uncertainty" (LB 62), but the district court made no such finding (A23-25).  The court instead

focused on the purported "fact that Nike was financially enriched by *activity that involved* willfully infringing Lontex's registered trademark," while acknowledging that "few, if any, of Nike's sales may have otherwise gone to Lontex." (A25 (emphasis added).) This rationale is not compensatory, much less a finding that NIKE was enriched or Lontex was harmed by the infringement itself. (NIKE Br. 53-54.) The court's only nod to compensation, in fact, was its acknowledgement that trebling damages might "*over*compensate Lontex to some degree." (A25 (emphasis added).)

Lontex also mistakenly focuses on NIKE's expert's testimony regarding the maximum amount of *NIKE's* profits—an issue separate from compensatory damages—that Lontex could recover, if any. (LB 62-63; A1942-43, 9T 120:20–121:14.) Moreover, that $800,000 ceiling is based on the amount for which Lontex was contractually obligated to sell its registered trademark, if offered. (A1973-75, 9T 151:4–153:21.) Neither the jury nor the district court found that a single penny of NIKE's sales of its NIKE PRO products was made *because of* the appearance of "cool compression" in style names for some of those products.

**Punitive Damages**. Lontex's defense of the punitive damages award consists largely of its mischaracterizations of the record. For example, Lontex claims that NIKE had "***extensive knowledge* of Lontex's valid federally registered and incontestable trademark in 'Cool Compression'**" even though it was

- 19 -

undisputed that NIKE was unaware of that trademark until sometime after "cool" and "compression" began appearing next to each in certain style names.  (LB 61 (emphasis added); NIKE Br. 28; *see* A34.)  Lontex once again misuses Deb White's deposition testimony in claiming that "cool compression" is "no different than Nike's own prized technology trademark in 'Dri-FIT,'" even though (among other differences) Dri-FIT actually was used on NIKE PRO products, labels, and hangtags.  (LB 61.)

Further, no evidence supports Lontex's assertion that NIKE "continued to exploit" the mark "because it believed Lontex was too small to do anything about it."  (LB 61.)  The record also shows that, far from "continu[ing] to exploit the mark," NIKE stopped placing "cool" and "compression" next to each other in style names and took other steps to address Lontex's concerns—even though NIKE continued to believe its use merely described certain features of products that were actually trademarked with "NIKE" and "NIKE PRO."  (*See* NIKE Br. 30.)

Lontex also incorrectly denies that its willfulness theory relied "'***entirely*** on the absence of a trademark search and the lack of immediate and complete cessation upon receipt of a cease-and-desist letter.'"  (LB 62 (quoting NIKE Br. 51-52) (emphasis added by Lontex).)  The trial transcript proves otherwise.  (A1519-21 7T 28:4–30:17.)  Even the remainder of Lontex's sentence in its appeal brief confirms that these were the only two bases of its willfulness theory (LB 62).

Far from identifying legally sufficient bases for enhanced and punitive damages, Lontex's arguments merely confirm their absence.

### F.    Lontex Cannot Justify the Legal Errors on Which the District Court's Exceptional Case Ruling and Fee Award Are Premised

Lontex's exceptional case argument is unmoored from the governing legal standards. Under *Octane Fitness*, "a district court may find a case 'exceptional,' and therefore award fees to the prevailing party, when (a) there is an unusual discrepancy in the merits of the positions taken by the parties or (b) the losing party has litigated the case in an 'unreasonable manner.'" *Fair Wind Sailing, Inc. v. Dempster*, 764 F.3d 303, 315 (3d Cir. 2014) (citing *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 554 (2014)). Courts must consider "the totality of the circumstances" as it relates to these two factors. *Id.*; *Octane Fitness*, 572 U.S. at 554. It is not an "anything goes" test that permits the Robin Hood rationale that was the primary basis of the district court's order. In suggesting otherwise, Lontex merely repeats the district court's legal error. (LB 63-69.)

### 1.    Lontex Largely Ignores the "Unreasonable Manner" Factor and the District Court's Findings Against It

Lontex barely acknowledges, much less contests, the district court's express findings that NIKE did not litigate this case in an "unreasonable manner." (A40 n.1. ("This case was defended by Nike vigorously, but not unreasonably."); A44

("[T]he Court is not finding that Nike engaged in any unfair, improper litigating strategy or that it litigated this case in a[n] 'unreasonable manner.'").)  This prong of *Octane Fitness* thus cannot support the exceptional case finding.

Lontex instead suggests in a footnote that it is somehow "egregiously improper" for NIKE to argue on appeal that it was wrong for the district court to base its exceptional case ruling on an alleged discrepancy between the parties' litigation resources while blocking any discovery about litigation funding.  (LB 69 n.†.)  But Lontex offers no substantive reason why NIKE's argument is wrong, much less beyond the pale.  Instead, Lontex perpetuates the district court's error by repeatedly alluding to an alleged disparity in the parties' litigation resources while hiding behind the court's discovery ruling on litigation financing.  (*See, e.g.*, LB 17-18, 37, 60, 65.)  It was erroneous enough for the district court to rely on the time-worn "David v. Goliath" trope in awarding fees in the first place.  (A42; *see* A18.)  It is even worse to do so while preventing the defendant from learning who, if anyone, is really behind the so-called "David" side of the contest.  And it is worse still for Lontex to repeatedly beat that drum on appeal—and accuse *NIKE* of impropriety for identifying the district court's error—while still refusing to make full disclosure.

## 2.    The District Court Did Not Find Any "Unusual Discrepancy" Between the Merits of the Parties' Positions, and Lontex Identifies None

Lontex also overlooks the district court's failure to find any "unusual discrepancy" between the merits of the parties' positions. *Fair Wind*, 764 F.3d at 315. In fact, the district court acknowledged that NIKE made "strong legal arguments regarding Lontex's claim of trademark infringement" and "important legal arguments" on fair use at summary judgment (A128, A133); that Lontex's counterfeiting claims lacked merit at the pleading stage (A71); that Lontex's exorbitant damages demands were "far beyond any reasonable potential for Lontex to achieve" (A43); and that the jury rejected "most of Plaintiff's claim on damages" after a "very incisive cross examination of Mr. Nathan" (A43). The court emphasized that "there is a major difference between the outcomes in the bifurcated trial" given the jury's decisive "rejection" of Lontex's exorbitant damages demands—a "rejection" that the district court explained "should not be of surprise to Lontex." (A43.) These well-supported findings refute any notion that there was an "unusual discrepancy" between the parties' positions on the merits.

Lontex has no real answer to these findings. Lontex instead cherry-picks the issues that went its way and criticizes NIKE for streamlining the trial by abandoning certain affirmative defenses. (LB 65-66.) Lontex also makes the illogical argument that "***Nike's factual arguments against infringement <u>at trial</u>***

- 23 -

***were so weak that the jury awarded punitive damages.***" (A65.) But the punitive damages award was not a function of the closeness of the case. Rather, the award was based on the instructions that allowed the jury to award punitive damages after finding willful infringement by a preponderance of the evidence. Even in denying JMOL, the district court found that Lontex's evidence on likelihood of confusion was "not overwhelming." (A33.)

Moreover, neither the jury's willfulness finding nor the award of punitive damages renders this case "exceptional." Under *Octane Fitness*, "it does not necessarily follow" from a willfulness determination "that the case is exceptional." *See Stryker Corp. v. Zimmer Inc.*, 837 F.3d 1268, 1279 (Fed. Cir. 2016). "[C]ourts routinely decline to award attorneys' fees in cases involving willful infringement." *Coty Inc. v. Excell Brands, LLC*, 277 F. Supp. 3d 425, 469 (S.D.N.Y. 2017). For example, the Sixth Circuit reversed a Lanham Act fee award as an abuse of discretion under *Octane Fitness* even though the jury found intentional infringement. *Max Rack, Inc. v. Core Health & Fitness, LLC*, 40 F.4th 454, 479 (6th Cir. 2022). And while Lontex claims that this Court stated in *Fair Winds* that a willfulness finding "is highly relevant" to determining whether a case is "exceptional" (LB 64), this Court said no such thing. Rather, it stated only that culpability "may well play a role in a district court's analysis of the 'exceptionality' of a case." *Fair Wind*, 764 F.3d at 315.

- 24 -

Besides its legal error, Lontex's argument is factually flawed too. Lontex claims that "Nike, a massive and global corporation, knew it was violating Lontex's 'Cool Compression' trademark, and yet continued to infringe that mark for years because it thought Lontex was too small to fight back." (LB 65.) But Lontex offers no evidence to support this inflammatory assertion. That is because none exists. There is no evidence that NIKE "knew" it was infringing Lontex's trademark. The unrefuted evidence instead showed that Nike was unaware of Lontex's mark when "cool" and "compression" began to appear next to each other in some style names and that Nike always believed that use was merely descriptive of its products' features. (NIKE Br. 28-30.) Nor is there any evidence that NIKE "thought Lontex was too small to fight back" or that it "continued to infringe" for that reason. (LB 65.) Again, quite the opposite: NIKE took steps to address Lontex's concerns after receiving the cease-and-desist letter even though it did not agree that there was anything unlawful about the challenged use. (NIKE Br. 28-30.)

### 3.    Lontex's Remaining Arguments Lack Merit

Lontex's remaining arguments merely amplify the district court's errors. The district court improperly concluded (without any legal basis) that the "'David and Goliath' aspect of this case" is "a factor in finding a case is 'exceptional'" and that "[r]epresentation of a plaintiff in a case like this should be rewarded in the

form of attorneys' fees against the Defendant as a matter of policy." (A42.) But the policies governing fee-shifting in trademark actions are prescribed by Congress in the Lanham Act. Congress has decided that the American Rule that each party bears its own attorney's fees applies to all Lanham Act claims—regardless of whether the plaintiff is small, or the defendant is large—unless a case is "exceptional." 15 U.S.C. § 1117(a). That policy is intended to *discourage* frivolous lawsuits, unreasonable litigation conduct, and meritless arguments—not to *encourage* more litigation by small companies against large companies. The district court was not free to depart from Congress's judgment based on its subjective view of what types of litigation should be encouraged.

Yet Lontex doubles down on the district court's impermissible rationale by urging this Court to affirm based on "the various power dynamics at play in a fight between a company like Nike and a much smaller competitor like Lontex." (LB 63-64, 67-68.) Lontex likewise improperly relies on a decades old legislative committee report that is not part of the statute and is inconsistent with *Octane Fitness*, and an out-of-context quotation from a fifty-year old decision stating only that litigating patent claims "is often staggering to the small businessman." (LB 63, 68.) Those considerations do not make this case "exceptional" or justify the district court's decision to award fees "as a matter of policy."

Lontex also misconstrues a footnote in *Octane Fitness*, which states that courts may "consider a 'nonexclusive' list of 'factors,' including 'frivolousness, motivation, objective unreasonableness, and the need in particular circumstances to advance considerations of compensation and deterrence.'" 572 U.S. at 554 n.6 (quoting *Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 534 n.19 (1994)); (LB 68.) The Supreme Court identified "compensation and deterrence" not as free-standing considerations, but rather in relation to the core "substantive strength" and "unreasonable manner" inquiries. *Id.* (paragraph beginning with "We hold"). Exceptionally weak cases and unreasonable litigation tactics, neither of which was found to exist here, are what fee-shifting is designed to compensate for and deter—not a size disparity between the parties' businesses.

In fact, the Supreme Court in *Fogerty* instructed that those factors may be considered only if they "are applied to prevailing plaintiffs and defendants in an evenhanded manner." 510 U.S. at 534 n.19. But it is the antithesis of "evenhanded" to deploy those factors to achieve a policy outcome of encouraging trademark litigation by small plaintiffs against large defendants. This would be true even if there were a factual basis for the district court's unsubstantiated assumption that "Lontex, with itself, would have to pay its attorneys." (A42.) It is even less appropriate to systematically tilt the scales in this way when the

defendant is prohibited from learning whether that assumption is true or false. (*See* A97-98; ECF 86-6 (privilege log).)

Lontex's responses to NIKE's appeal arguments therefore lack merit.

## IV.    ARGUMENT IN RESPONSE TO LONTEX'S CROSS-APPEAL

### A.    The District Court Properly Exercised Its Discretion in Denying Disgorgement of Profits

This Court reviews a district court's decision on equitable trademark remedies, including whether to disgorge any profits, for abuse of discretion. *Banjo Buddies, Inc. v. Renosky*, 399 F.3d 168, 173 (3d Cir. 2005). Here, the district court properly exercised its discretion in denying Lontex's request for disgorgement of NIKE's profits. Both of Lontex's contrary arguments miss the mark.

First, Lontex mischaracterizes the district court's order in asserting that the court failed to exercise any independent judgment. The district court made the findings required by this Court's precedent and exercised its equitable discretion in denying disgorgement. Any weight that the court gave the jury's verdict in this process was also within its discretion and consistent with this Court's precedent.

Moreover, in the damages phase of the trial, Lontex unequivocally argued that the district court should submit disgorgement to the jury. So even if there were any error in the district court's use of the jury's verdict, it would be an error that Lontex invited. Lontex changed its tune only after the jury rejected Lontex's

emotional pleas for disgorgement by finding that none was warranted. Lontex

therefore cannot be heard to complain of any such error now.

Second, Lontex improperly urges this Court to order disgorgement and set a

floor for the amount. This Court's precedent makes clear that disgorgement is

never a matter of right, and the district court had broad discretion to do exactly

what it did here: order no disgorgement at all in light of the facts of the case.

Lontex's proposed $7.1 million "floor" also contradicts the law and the ample

evidence establishing a $0 to $800,000 maximum range for any disgorgement.

Lontex has not identified any abuse of discretion in the district court's

assessment of this Court's *Banjo Buddies* factors for disgorgement of profits in

trademark cases. Lontex instead improperly asks this Court to replace that

assessment with one more to Lontex's liking. The district court's denial of

disgorgement therefore should be affirmed.

### 1.    The District Court Permissibly Consulted the Jury's Verdict in Making Its Own Ruling on Disgorgement

Disgorgement of profits is an equitable remedy under the Lanham Act. *See*

15 U.S.C. § 1117(a) ("subject to the principles of equity," a trademark plaintiff

may recover "defendant's profits"). It "does not follow as a matter of course upon

the mere showing of an infringement." *A & H Sportswear, Inc. v. Victoria's Secret

Stores, Inc.*, 166 F.3d 197, 209 (3d Cir. 1999) (citation omitted); *see also*

*Covertech Fabricating, Inc. v. TVM Bldg. Prods., Inc.*, 855 F.3d 163, 177 (3d Cir. 2017) (vacating $4,054,319 disgorgement award).

The decision whether to disgorge profits is committed to the district court's equitable discretion. *Banjo Buddies*, 399 F.3d at 173. The court also may use an advisory verdict to aid its assessment. Fed. R. Civ. P. 39(c)(1) (court "may try any issue with an advisory jury," on motion or *sua sponte*). The court then has full discretion to accept or reject the advisory jury's findings. *See Hayes v. Community Gen. Osteopathic Hosp.*, 940 F.2d 54, 57 (3d Cir. 1991).

### a.    The District Court Made Independent Written Findings

Lontex splices together highly selective quotations from the district court's decision on disgorgement to argue incorrectly that the court exercised no independent judgment. (LB 75-76.) A review of the district court's entire findings and conclusions tells a different story. (A21-23.) For example, after noting its obligation to consider this Court's *Banjo Buddies* factors, the district court stated: "The Court finds that, on the whole, the <u>Banjo Buddies</u> factors favor non-disgorgement." (A21.)

Having sat through nearly two weeks of trial, the district court went on to find: "There is no evidence that Nike intended to confuse or deceive anyone through use of the term 'cool compression,' nor that sales were diverted from

Lontex to Nike. To the contrary, several past Lontex customers testified at trial, and none indicated that they had purchased Nike products using the term 'cool compression' when they meant to purchase Lontex cool compression products." (A21-22; *see also* A23 ("In the final analysis, there is simply no evidence that any measurable portion of the profits that Nike made through the sale of products using the words 'cool compression' would have otherwise flowed to Lontex, a much smaller company that targets its cool compression products to a much more specialized consumer base.").) The court also found: "There was also no evidence presented that Nike was 'palming off'—in other words, that Nike sought to convince customers that Nike products using the words 'cool compression' were actually Lontex products." (A22.) In these findings—which covered the first, second, and sixth *Banjo Buddies* factors—the district court did not even refer to the jury's verdict on disgorgement. (A21-22.)

The district court then found that "[t]he third, fourth, and fifth factors are more favorable for Lontex." (A22.) Yet in this discussion, the court also found "there is no evidence that Nike's use of the term 'cool compression' had any causal relationship to a decline in Lontex's sales." (A22.) The court thus found that "[w]ith regard to the adequacy of other remedies, the relatively low amount of compensatory damages awarded by the jury is not necessarily unreasonable." (A22.)

The court next discussed the evidence with reference to the jury's findings and distinguished a case that Lontex had cited.  (A22-23.)  This discussion indicates, of course, that the district court found the jury's verdict to be instructive—just as FRCP 39 contemplates.  And if the district court's independent findings are ignored—as Lontex would have it—such statements in isolation might be construed as deference to that verdict.  (*See also* A25 ("Although the Court rejects Lontex's request for disgorgement, it does so because the jury has already spoken on that issue.").)  But when the district court's findings are viewed in their entirety, Lontex's portrayal cannot withstand scrutiny.

The district court thus did not err in its approach to disgorgement.  And even if it had, it made sufficient independent findings to render any such error harmless.  Lontex's cross-appeal argument should be rejected.

       **b.**      **The District Court Also Had Discretion to Accept the Jury's Findings on Disgorgement**

Lontex also disregards this Court's precedent on advisory verdicts.  As shown above, the district court made independent findings and did not just blindly accept the jury's verdict.  But to the extent the district court accepted the jury's findings in its analysis, it was consistent with this Court's precedent.

Specifically, this Court has held that "[a] trial court has full discretion to accept or reject the findings of an advisory jury."  *Hayes v*, 940 F.2d at 57.

Similarly, this Court has held: "Although a trial court is in no way bound by the answers of an advisory jury, *it may adopt the jury's findings as its own*." *Greenwood v. Greenwood*, 234 F.2d 276, 278 (3d Cir. 1956) (emphasis added). The district court correctly instructed the jury on the *Banjo Buddies* factors (A2046-47, 9T 224:14–225:24), and the jury found that Lontex had not shown it was entitled to any amount of disgorgement (A273, A2066, 10T 5:16-17). Accordingly, to the extent the district court "accept[ed]" or adopt[ed] . . . as its own" the jury's findings on disgorgement, there was no error in doing so. *Hayes*, 940 F.2d at 57; *Greenwood*, 234 F.2d at 278.

### c.     Any Error Was Invited by Lontex and Thus Cannot Be a Basis for Relief

Finally, even if this Court were to find any improper reliance on the jury's disgorgement verdict, the invited error doctrine precludes any relief. "The doctrine of 'invited error' refers to '[a]n error that a party cannot complain of on appeal because the party, through conduct, encouraged or prompted the trial court to make the erroneous ruling.'" *Lima v. Newark Police Dep't*, 658 F.3d 324, 333 n.2 (3d Cir. 2011) (quoting BLACK'S LAW DICTIONARY 622 (9th ed. 2009)). Here, Lontex asked the district court to submit disgorgement to the jury. Disappointed by the outcome, Lontex now asks this Court to reject the very approach Lontex urged below. But Lontex cannot obtain relief from an alleged error it brought upon itself.

The trial was bifurcated into liability and damages phases before the same jury. After prevailing on liability, Lontex implored the district court to submit the issue of disgorgement of NIKE's profits to the jury. (A1617-19, 8T 7:19–9:24; A1699-1701, 8T 89:18–91:6; *see also* A1795-98, 8T 185:8–188:1 (further discussion of the issue and district court rulings).) Lontex argued unequivocally that this issue "should be submitted to the jury." (A1619, 8T 9:22-24.) Not once during damages phase did Lontex state that the court should decide the issue independently or that any jury verdict should be merely advisory.

Also, during the damages phase of trial, Lontex proposed jury instructions that required the jury to decide disgorgement. (Dkt. No. 358 at 8-9.) Lontex's proposed instruction began: "You *must* consider whether NIKE's willful infringement supports disgorging the infringing profits." (Dkt. No. 358 at 8 (emphasis added).) It then said: "There are three independent bases upon which *a jury may disgorge infringing profits* – (1) if Nike's infringement resulted in unjust enrichment, (2) if Nike's infringement warrants deterrence, and (3) if the infringing sales act as a measurement of Lontex's own damages." (Dkt. No. 358 at 8 (emphasis added); *see also id.* ("As you consider an award of Nike's profits, you should examine the following: [enumerating *Banjo Buddies* factors].").) In contrast to NIKE's proposed instruction on disgorgement, which was made expressly "[s]ubject to Nike's objection to the issue of disgorgement being

presented to the jury" (Dkt. No. 356 at 3), Lontex included no such conditional or qualifying language (*see* Dkt. No. 358). Likewise, Lontex's proposed verdict form contained a line item for "Defendant's Profits"—again without objection or qualification. (Dkt. No. 359 at 2.)

"When a litigant takes an unequivocal position at trial, he cannot on appeal assume a contrary position simply because the decision in retrospect was a tactical mistake, or perhaps a candid but regretted concession." *Fleck v. KDI Sylvan Pools, Inc.*, 981 F.2d 107, 116 (3d Cir. 1992) (holding that litigant waived right to contest directed verdict after arguing at trial that issue was "not a Jury question"); *Robinson v. First State Cmty. Action Agency*, 920 F.3d 182, 189 (3d Cir. 2019) (finding waiver of argument and refusing to review instruction for plain error where litigant "invited the District Court to use the four-part test from *Williams* it now argues is incorrect"). Lontex's current argument contradicts the unequivocal position it took at trial. "Thus, if there was any error at all, it was 'invited error' and cannot now be a basis for reversal." *United States v. W. Indies Transp., Inc.*, 127 F.3d 299, 306 (3d Cir. 1997) (citations and quotations omitted).

## 2. The District Court Properly Declined to Award Disgorgement

Substantively, Lontex also fails to show that the district court abused its discretion in awarding no disgorgement. Just like the jury, the district court

evaluated the *Banjo Buddies* factors and reasonably determined that Lontex was

not entitled to any of NIKE's profits from the sale of its NIKE PRO products.

> **a.    Lontex's Request that This Court Order Disgorgement "as a Matter of Law" Contradicts Precedent**

Much of Lontex's appellate pitch for disgorgement simply repeats its

Orwellian refrain of *small company good, big company bad*. (LB 77-83.) This

rhetoric culminates in Lontex's erroneous argument that "[g]iven the underlying

facts of this case and the relative disparity in both size and resources between the

parties, disgorgement of Nike's profits is essential, as a matter of law." (LB 79.)

But this Court has held that disgorgement is not automatic and is never a matter of

right. *See, e.g.*, *Covertech*, 855 F.3d at 177; *A & H Sportswear*, 166 F.3d at 209.

Rather, the possibility of disgorgement is always "subject to the principles of

equity." 15 U.S.C. § 1117(a).

In addition to this fundamental legal error, the remainder of that paragraph in

Lontex's brief encapsulates many of the factual errors that pervade Lontex's

argument on disgorgement.

First, Lontex improperly asserts that NIKE infringed "because it thought

Lontex was too small to fight back." (LB 79.) Absolutely no evidence supports

Lontex's assertion, and Lontex cites none. (LB 79 (cross-referencing LB 17-18).)

Second, Lontex incorrectly asserts that "Nike flooded the market with its infringing mark." (LB 79.) Even if one accepts the jury's infringement verdict, it is still undisputed that "cool compression" never appeared on any NIKE product, label, hangtag, or packaging, was never featured in any advertising campaign or promotion, and did not appear consistently in style names. (NIKE Br. 8-9.) This hardly amounts to "flood[ing] the market" with a trademark.

Third, Lontex is wrong to assert (at 79) that NIKE sold "many millions of dollars in infringing product" because there was no allegedly infringing *product* in this case. Again, it is undisputed that not a single NIKE product bore "cool compression" on the product itself or any label or hangtag. The jury was presented with a case of allegedly infringing textual uses in some style names that appeared almost exclusively in catalogues, tech sheets, and online. This is a far cry from a case of "infringing product" bearing a trademarked logo or phrase.

Fourth, Lontex similarly has no basis for claiming that NIKE "received nothing more than (from Nike's perspective) a meaningless slap on the wrist of $507,000 in damages." (LB 79-80.) Lontex's assertion ignores the permanent injunction and other remedial orders (some of which are also challenged on appeal) entered against NIKE. Moreover, Lontex is not the arbiter of "Nike's perspective." This is a case where NIKE was found liable for conduct that NIKE always believed was a legitimate business activity that caused no consumer confusion or

damage to anyone's business. From that vantage point, the permanent injunction and any other remedy are hardly "meaningless" to NIKE.

Lontex's heavy reliance on two completely inapposite cases—neither of which even applied the *Banjo Buddies* factors—underscores its legal and factual errors. (LB 78-80 (repeatedly citing *Marshak v. Treadwell*, 595 F.3d 478 (3d Cir. 2009), and *W.E. Bassett Co. v. Revlon Inc.*, 435 F.2d 656 (2d Cir. 1970).)

*Marshak* addressed whether disgorgement was an appropriate remedy for the willful violation of an injunction. 595 F.3d at 485-89, 494-96. In the decade that had followed entry of the injunction, the defendants "engag[ed] in an elaborate shell game through their creation of various business identities in an attempt to deceive [plaintiff] and the Court." *Id.* at 494. The defendants were all "aware of the injunction" when doing so, and "all of them benefitted financially from their violation of the injunction." *Id.* at 494-95. On appeal, this Court held it was an error to permit the contemnors "to keep whatever profits they gained as a result of their disregard for [the district court's] injunction." *Id.* at 496 (emphasis added). This Court's also explained that limiting plaintiff's "remedies to mere attorneys' fees would result in the perversity of imposing less demanding remedies on Appellants after the finding of contempt than were imposed before the finding of contempt." *Id.* at 495. None of these concerns—and nothing remotely

approaching *Marshak's* underlying facts and procedural posture—is present here. *See* A23 (correctly distinguishing *Marshak*).

The Second Circuit's *W.E. Bassett* decision is also inapposite. Like *Marshak*, that case involved a defendant who engaged in willful violations of an injunction. 435 F.2d at 664-65. The district court ordered an accounting based on a finding of deliberate and fraudulent infringement and "callous disregard for the rights of a competitor and for the mandates of the federal courts." *Id.* Again, nothing like that exists here. To the extent Lontex uses *W.E. Bassett* to suggest that willful infringement mandates disgorgement, that proposition contradicts this Court's precedent. *See, e.g.*, *Kars 4 Kids Inc. v. American Can!*, 8 F.4th 209, 223 (3d Cir. 2021); *Banjo Buddies*, 399 F.3d at 173.

Lontex's request for disgorgement "as a matter of law" therefore should be rejected.

> **b.    The *Banjo Buddies* Factors Weigh Strongly Against Disgorgement**

The district court also reasonably exercised its discretion in concluding that no disgorgement was warranted under the *Banjo Buddies* factors. Lontex's improper invitation for this Court to assess those factors anew should be rejected. If anything, the district court *understated* the strength of NIKE's position on several factors.

**Factor 1: Intent to Confuse or Deceive.**  As the district court correctly recognized (A21), the record is completely bereft of any evidence that NIKE had the "intent to confuse or deceive" consumers.  *Banjo Buddies*, 399 F.3d at 175; (A2046-47, 9T at 224:25–225:1).  NIKE was not even aware of Lontex until it received a cease-and-desist letter in April 2016.  (*See, e.g.*, A1125-26, 5T 66:15–67:16; A1406, 6T 172:17-22; A1171, 5T 112:7-23.)

Lontex's argument rests solely on the jury's willfulness finding.  (LB 80.)  But even if willfulness survives, Lontex failed to adduce any evidence that NIKE intended to confuse or deceive.  Instead, Lontex relied solely on facts regarding NIKE's trademark clearance and continued sale of its products after receiving a cease-and-desist letter.  Not all findings of willful infringement are alike, and "a jury verdict of willfulness simply does not bar a district court from determining the egregiousness of a willful infringer's conduct."  *Electro Sci. Indus., Inc. v. Gen. Scanning Inc.*, 247 F.3d 1341, 1354 (Fed. Cir. 2001); *see also Romag Fasteners, Inc. v. Fossil, Inc.*, 140 S. Ct. 1492, 1497 (2020) (the Lanham Act endorses "a principle long reflected in equity practice where district courts have often considered a defendant's mental state, among other factors, when exercising their discretion in choosing a fitting remedy"); *Western Diversified Servs., Inc. v. Hyundai Motor Am., Inc.*, 427 F.3d 1269, 1273 (10th Cir. 2005) ("Even with a finding of willfulness, a court may still exercise its discretion to reduce or even

eliminate a profit award in the name of fashioning an equitable remedy to meet the needs of each case.").  The willfulness verdict alone cannot tilt this factor toward disgorgement, especially where the same jury found that Lontex should not receive any of NIKE's profits and that NIKE did not cause Lontex to lose any profits. (A2066, 10T 5:1-17.)

Given "equity's resistance to rigid rules" and the settled principle that "exercise of a court's equity powers . . . must be made on a case-by-case basis," Lontex's *willfulness equals disgorgement* argument should be rejected.  *Holland v. Florida*, 560 U.S. 631, 649-51 (2010) (internal quotations omitted).  Rather, the first factor weighs strongly against disgorgement.

**Factor 2: Sales Diversion from Lontex to NIKE.**  As the district court also correctly recognized (A21), there was no evidence that even a single sale was diverted from Lontex to NIKE because of "cool compression."  *Banjo Buddies*, 399 F.3d at 175; (A2047, 9T 225:2-3).  This further indicates that NIKE was not unjustly enriched by any use of "cool compression."  *See, e.g.*, *Gucci Am., Inc. v. Daffy's Inc.*, 354 F.3d 228, 243 (3d Cir. 2003) (disgorgement is unwarranted where "the record does not establish that the infringer was enriched *because of* the owner's mark").  The jury reached the same conclusion when it declined to award "lost profits" damages to Lontex.  (A2066, 10T 5:1-9.)  This factor weighs strongly against disgorgement too.

**Factor 3: Adequacy of Other Remedies**.  The third *Banjo Buddies* factor is the adequacy of other remedies, "such as compensatory damages."  *Banjo Buddies*, 399 F.3d at 175; (A2047, 9T 225:4-5; *see also* A2044-47, 9T 222:15–226:19).  The jury awarded Lontex $142,000 as compensatory damages, and the evidence showed this was more than adequate to compensate Lontex for any harm.  By contrast, disgorgement was deemed equitable in *Banjo Buddies* because otherwise the plaintiff would have been "wholly uncompensated for [the defendant's] infringing actions."  399 F.3d at 176.

Further, profits disgorgement "will be denied where an injunction satisfies the equities of a case," *A & H Sportswear*, 166 F.3d at 209, and that is the case here.  No law supports the notion that monetary relief is inadequate simply because it disappoints the plaintiff's hopes for a much larger sum.

**Factor 4: Unreasonable Delay**.  The fourth factor is "any unreasonable delay by Lontex in asserting its trademark rights."  (A2047, 9T 225:4-5); *Banjo Buddies*, 399 F.3d at 175.  Lontex learned about NIKE's challenged use in December 2015 but did not file suit until December 2018.  (2T 88:17–20; A589-90, 2T 169:14–170:17; A169 (docket sheet).)  Lontex also never sought a preliminary injunction.  Trademark owners typically seek redress to swiftly quell sales that have caused or are likely to cause confusion with its own brand.  *See* 1

MCCARTHY ON TRADEMARKS § 2:22. But the record shows that Lontex's concern was monetizing its trademark registrations—not averting any consumer confusion.

If Lontex had truly believed its business was suffering as a result of NIKE's conduct (a conclusion the jury rejected), it could have acted much more promptly. This dilatory conduct should not be rewarded with a share of NIKE's profits. Lontex ignores its testimony that it had a team of lawyers and support staff working to build evidence for this case as early as 2016. (A865, 4T 66:10-17.) Lontex's delay is not reasonable behavior for a rights holder who was legitimately concerned about consumer confusion or harm to its business. Lontex was instead content to wait as NIKE's profits grew from its sales of NIKE PRO products. This factor also weighs strongly against disgorgement.

**Factor 5: Public Interest.** The fifth factor is the "public interest in making NIKE's infringement of the Cool Compression trademark unprofitable." (A2047, 9T 225:8-9); *Banjo Buddies*, 399 F.3d at 175. "Deterrence" and "punishment" were the central themes of Lontex's emotionally charged closing. (*See, e.g.*, A2024, A2028-29, 9T 202:14-15, 206:4-5, 207:21-23.) Yet both the jury—consisting of ten members of the public—and district court declined to award profits. Moreover, there is no evidence that NIKE profited from its use of the phrase "cool compression" or that even a single sale was made *because of* the use

of those words.  The jury's damages verdict also reflects that view.  This factor weighs against disgorgement.

**Factor 6: Palming Off.**  The sixth factor is "whether this is a case of palming off."  (A2047, 9T 225:10-11.)  As this Court instructed the jury (without objection), "no evidence has been presented to suggest that NIKE was palming off."  (A2047, 9T 225:12-13.)  This factor strongly favors NIKE.  *See CPC Props., Inc. v. Dominic, Inc.*, 2013 WL 5567584, at *4 (E.D. Pa. Oct. 9, 2013) (profits declined where evidence of palming off "relatively thin" and defendant had not "meticulously crafted" its product and ads "to be identical to a trademarked product").

"[A]n award of profits under the Lanham Act is truly an extraordinary remedy and should be tightly cabined by principles of equity."  *Western Diversified*, 427 F.3d at 1274.  The district court properly exercised its discretion by declining to take this "extraordinary" step here.  Lontex has given no good reason to disturb that conclusion.

> **c.    Lontex's Request that This Court Establish a Floor for Disgorgement Is Legally and Factually Unsupported**

Even if this Court were to remand on disgorgement (it should not), Lontex's insistence that this Court set a range of $7.1 million to $95.6 million is wholly improper.  As explained above, disgorgement is never awarded as a matter of right,

and the district court exercises its equitable discretion to determine whether it is appropriate and, if so, in what amount.  Further, the evidence showed that, even if disgorgement were ordered, the maximum possible amount is $800,000.  (A1943, 9T 121:8-9.)

Because "cool compression" did not appear on any NIKE product, labels, hangtags, or packaging, Lontex's claims were based on NIKE's use of the words "cool" and "compression" next to each other almost exclusively in written materials like NIKE wholesale catalogs, webpages on nike.com, and internal "Tech Sheets" used to educate sales associates about product features.  (NIKE Br. 8-12.) Lontex did not present evidence that NIKE used "cool compression" in connection with all sales for each accused style numbers from 2015 to 2018.  Instead, it urged the jury to "infer" such usage occurred in connection with every sale of every accused style number based solely on the misleading "summaries" of such usage in isolated contexts, which Lontex's counsel had prepared in advance of trial.  (A853-902, 4T 54:8–103:10; PX30A, PX30B, PX31, PX32, PX33.)  But NIKE presented evidence that raised substantial doubts about Lontex's overreaching assumptions about NIKE's sales.  (*See, e.g.*, A853-902, 4T 54:8–103:10; A1853-58, A2016, 9T 31:7–36:12, 194:4-9; A2702-06.)  Lontex thus failed to meet its burden on this issue.

Moreover, Lontex's proposal violates five legal principles that circumscribe any disgorgement that could be awarded here.

First, disgorgement cannot result in a windfall to a plaintiff. *See Stone Creek v. Omnia Italian Design, Inc.*, 808 F. App'x 460-61 (9th Cir. 2020) ("The Lanham Act does not entitle plaintiffs to windfalls."). Here, Lontex never claimed more than $165,000 in annual gross sales and could not even sell the COOL COMPRESSION trademark for $150,000 when it tried. (A1986, 9T 164:13-17; NIKE Br. 7.)

Second, disgorgement cannot be used to penalize a defendant. *See Safeway Transit LLC v. Discount Party Bus, Inc.*, 954 F.3d 1171, 1177 (8th Cir. 2020) ("[T]he Lanham Act does not permit the award of monetary relief as a penalty."). Lontex's proposed award would go well beyond "compensation" and amount to an impermissible penalty.

Third, "[o]nce an award is found to be appropriate"—which it is not here— "a markholder is only entitled to those profits attributable to the unlawful use of its mark." *Quick Techs., Inc. v. Sage Group PLC*, 313 F.3d 338, 349-50 (5th Cir. 2002) (internal quotations omitted) (cited in *Gucci*, 354 F.3d at 242). Lontex's proposed award would destroy this causal nexus requirement. Lontex's damages expert Mr. Drews admitted that he never analyzed what NIKE sales were attributable to the infringing use of "cool compression" because "that was not [his]

task." (A1850, 9T 28:5-16; A1860, 9T 38:15-19.) Instead, he improperly assumed that "cool compression" was present at the point of sale for every sale. (A1845, 9T 23:16-19; A1848, 9T 26:9-13; A1850, 9T 28:8-16; A1851, 9T 29:2-6; A1858, 9T 36:7-12.) He further assumed that each sale was attributable to use of "cool compression," versus myriad other factors and NIKE's own contributions that drove NIKE PRO sales. (A1847, 9T 25:8-20.) The district court correctly recognized these problems and expressed "grave doubts about the propriety of [Lontex's] expert using all of these product numbers that say Cool Compression as assuming the basis for sales, and this goes to the disgorgement of profits." (A2016, 9T 194:4-9.)

Fourth, Lontex's proposed calculations violate this Court's holding that any such calculation must be grounded "in the record . . . in order to pass muster as a reasonable estimate and an appropriate exercise of discretion." *Covertech*, 855 F.3d at 176. NIKE showed at trial that Mr. Drew's damages opinions—which the jury necessarily rejected by virtue of its damages award—were unreliable and inconsistent with the law. Thus, even if disgorgement could be appropriate at all, NIKE's expert Mr. Meyer provided the only reliable evidence-based expert opinion on which such an award could be premised. Mr. Meyer identified and isolated the sales where there was actual evidence of NIKE's use of "cool compression" in connection with the sale. (A1944, 9T 122:3-12; *see* A1942-78,

9T 120:3-156:11.)  Then, Mr. Meyer took the gross sales for those products and, unlike Mr. Drews, calculated NIKE's net profits from those sales before apportionment, resulting in potential profits ranging from $2.8 million to 7.1 million.  (A1943, A1985-86, 9T 121:4-9, 163:16–164:24); *see 4 Pillar Dynasty LLC v. N.Y. & Co.*, 933 F.3d 202, 214 (2d Cir. 2019) (explaining that the general rule is that "an award of an infringer's profits under the Lanham Act can be expected to refer to net profits"—not gross profits, as Lontex contends).  Finally, Mr. Meyer apportioned NIKE's profits to use of "cool compression" and NIKE's non-infringing contributions to each sale, and opined that the appropriate range after apportionment was between $0 and $800,000—the maximum being the value for which Lontex was contractually bound to sell COOL COMPRESSION.  (A1972-78, 9T 150:16–156:11.)  "Where the court lacks a sound basis for extrapolating actual profits, it abuses its discretion by resorting to guesswork"— and guesswork is all that Lontex offered here.  *Covertech*, 855 F.3d at 177.

Fifth, disgorgement is "inconsistent with a claim of reverse confusion," which Lontex insists that it proved here.  *Koninkijke Philips Electronics N.V. v. Hunt Control Sys., Inc*, 2016 WL 3545529, at *26 (D.N.J. June 29, 2016).

Accordingly, while there is no basis for a remand on disgorgement at all, if there were a remand, any award should be in the $0 to $800,000 range.  Anything more would be both legally and factually unsupported.

**B.      Lontex's Counterfeiting Claims Fail as a Matter of Law and Were Properly Dismissed at the Pleading Stage**

The district court correctly dismissed Lontex's counterfeiting claims at the pleading stage.  Lontex did not and could not plead any facts that plausibly support the conclusion that NIKE's use of "cool" and "compression" next to each other in certain product style names was somehow a "counterfeit" of Lontex's mark.  This portion of the district court's judgment therefore should be affirmed on *de novo* review.

**1.      The District Court's Dismissal Order**

After NIKE had moved to dismiss the counterfeiting claims in the original complaint, Lontex filed a First Amended Complaint ("FAC").  (A54.)  NIKE again moved to dismiss the counterfeiting claims, and the district court granted the motion without leave to amend.  (A50-71.)

The district court explained that counterfeiting is "'the act of producing or selling a product with a sham trademark that is an intentional and calculated reproduction of the genuine trademark.'"  (A60 (quoting *Louis Vuitton Malletier & Oakley, Inc. v. Veit*, 211 F. Supp. 2d 567, 581 (E.D. Pa. 2002)).)  The court further explained that counterfeiting requires a heightened degree of similarity compared to ordinary trademark infringement—specifically, a demonstration that "Nike's mark is 'identical with, or substantially indistinguishable from' Lontex's mark

from the perspective of an average purchaser." (A64 (after extensive discussion of case law at A60-64).)

The district court then applied these legal standards to the FAC's allegations. (A65-70.) Among other things, the court observed that "[t]he addition of 'NIKE PRO' or 'PRO' [is] not a 'minor difference[]' that the average consumer would disregard when comparing marks that are otherwise 'identical' or 'substantially indistinguishable.'" (A65 (citation omitted).) The court also rejected Lontex's argument that "the context in which word marks are used is irrelevant to a court's determination of whether a mark is a counterfeit." (A66.) The court concluded: "Even taking the factual allegations in the FAC as true, as the Court must at this stage, the Court cannot reasonably conclude that Nike's mark is 'identical with, or substantially indistinguishable from' Lontex's mark from the perspective of an average customer." (A67.) The court also denied leave to amend. (A67-70.)

### 2. Counterfeiting Requires the Use of a Mark that Is Both "Spurious" and "Identical with, or Substantially Indistinguishable from, a Registered Mark"

The Lanham Act defines a "counterfeit" mark as "a spurious mark which is identical with, or substantially indistinguishable from, a registered mark." 15 U.S.C. § 1127. The plain meaning of "spurious," in turn, is "[d]eceptively suggesting an erroneous origin; fake.'" *Spurious*, BLACK'S LAW DICTIONARY (11th ed. 2019). Numerous courts have adopted that definition when interpreting this

provision of the Lanham Act.  *See, e.g.*, *Excelled Sheepskin & Leather Coat Corp.*
*v. Oregon Brewing Co.*, 2015 WL 4468083, at *3 (S.D.N.Y. July 8, 2015)
(collecting cases); *United States v. Chong Lam*, 677 F.3d 190, 202 (4th Cir. 2012).

The accused mark must also be "identical with, or substantially
indistinguishable from, a registered mark." 15 U.S.C. § 1127.  Accordingly,
"[c]ounterfeiting has a higher standard for similarity so the 'likelihood to cause
confusion' standard used for infringement violations is insufficient." *Astrazeneca*
*AB v. Dr. Reddy's Labs., Inc.*, 209 F. Supp. 3d 744, 755 (D. Del. 2016).

As the leading trademark treatise explains, counterfeiting is "the act of
producing or selling a product with a sham trademark that is an intentional and
calculated reproduction of the genuine trademark."  4 MCCARTHY ON
TRADEMARKS § 25:10.  "Often, counterfeit merchandise is made so as to imitate a
well-known product in all details of construction and appearance so as to deceive
customers into thinking that they are getting genuine merchandise." *Id.*; *see also*
*Gucci Am., Inc. v. Guess?, Inc.*, 868 F. Supp. 2d 207, 237 (S.D.N.Y. 2012)) (noting
that "courts have uniformly applied [the counterfeiting] provision to products that
are stitch-for-stitch copies of those of another brand").  "Thus, counterfeiting is
'hard core' or 'first degree' trademark infringement and is the most blatant and
egregious form of 'passing off.'"  4 MCCARTHY ON TRADEMARKS § 25:10.

**3.    Lontex's First Amended Complaint Lacked Any Factual Allegations that Could Plausibly Support Its Counterfeiting Claims**

The FAC had no factual allegations that could plausibly show counterfeiting. Lontex did not allege any facts that even remotely suggest that NIKE intentionally created a calculated reproduction of Lontex's mark and attempted to deceive consumers by passing off its products as genuine Lontex products—*i.e.*, the "essence" of counterfeiting, *Audemars Piguet Holding S.A. v. Swiss Watch Int'l, Inc.*, 2015 WL 150756, at *2 (S.D.N.Y. Jan. 12, 2015).

Lontex was required to allege facts plausibly indicating that NIKE used a "spurious mark," 15 U.S.C. § 1127—*i.e.*, one "deceptively suggesting an erroneous origin; fake"—that "is identical with, or substantially indistinguishable from," Lontex's registered COOL COMPRESSION mark, *Chong Lam*, 677 F.3d at 202. Lontex also was required to allege facts plausibly indicating that NIKE was "passing off" its allegedly infringing goods as Lontex's, "rather than merely presented in a manner likely to confuse some consumers as to the origin or sponsorship of the infringer's product." *Fujifilm N. Am. Corp. v. PLR IP Holdings, LLC*, 2019 WL 274967, at *3 (S.D.N.Y. Jan. 7, 2019) (citing cases); *Cohen & Co., Ltd. v. Cohen & Co. Inc.*, 2022 WL 5250271, at *2 (E.D. Pa. Oct. 6, 2022).  And of course, "to properly plead a case of civil counterfeiting it is not sufficient for plaintiff to make a conclusory allegation that the accused use is 'nearly identical'

and a 'counterfeit.'"  4 McCarthy on Trademarks § 25:15.50; *see generally Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007).

Applying these standards, the district court correctly dismissed with prejudice Lontex counterfeiting claim.  (A65-70.)  Lontex relied heavily on the conclusory assertion (without factual support) that "NIKE's use constitutes a counterfeit."  (A223-26, FAC ¶ 44; *see id*. ¶¶ 41, 43, 60, 65.)  But conclusory assertions do not suffice under *Twombly*.  The only non-conclusory allegations in the entire complaint relating to NIKE's purportedly "counterfeit" use of the "Cool Compression" was that NIKE "includ[ed] the [NIKE] house mark" with the allegedly infringing products and that those products were sold under the "NIKE Pro Cool Compression" designation and "placed in NIKE catalogues." (A218-19, FAC ¶¶ 20, 22, 24.)

Specifically, Lontex alleged that, "[i]n a sample division / catalogue of NIKE, there were 6 item numbers for Cool Compression products:"

> 728044 NIKE PRO COOL COMPRESSION SLEEVELESS TOP
> 728048 NIKE PRO COOL COMPRESSION SHORT-SLEEVE TOP
> 719903 NIKE PRO COOL COMPRESSION 1/2 SLEEVE TOP
> 828642 NIKE PRO COOL COMPRESSION 3/4 TIGHT
> 728047 NIKE PRO COOL COMPRESSION LONG-SLEEVE TOP
> 728049 NIKE PRO COOL 6" COMPRESSION SHORT

(A218, FAC ¶ 20; *see* A219, FAC ¶¶ 22, 24.)

As a matter of law, the use of these style names cannot amount to "counterfeiting."  There was no factual allegation indicating that NIKE used a "spurious mark" that was "identical with, or substantially indistinguishable from," Lontex's mark.  In fact, the accused style names include *NIKE's own trademarks* that identify NIKE as the source of the goods.

The accused marks are therefore quite the opposite of "spurious."  Far from "deceptively suggesting an erroneous origin," they expressly inform consumers of the true origin of the products.  Lontex's own allegations therefore foreclose any counterfeiting claim as a matter of law.  *See, e.g.*, *See Kelly-Brown v. Winfrey*, 717 F.3d 295, 314-15 (2d Cir. 2013) (affirming dismissal of trademark counterfeiting claim where a cursory visual inspection of the parties' products revealed differences between asserted mark and accused use); *Associated Gen. Contractors of Am. v. Stokes*, 2013 WL 1155512, at *6 (E.D. Va. Mar, 19, 2013) ("[T]he advertisement displayed the name 'American General Construction Association' right next to the 'A.G.C.' mark and circular logo. Even if the Court found that the 'A.G.C.' mark and circular logo was substantially indistinguishable from AGC's registered marks, the Court could not find that the document was counterfeit when it does not even purport to come from Associated General Contractors of America."); *Gibson Brands, Inc. v. John Hornby Skewes & Co.*, 2016 WL 7479317, at *7 (C.D. Cal. Dec. 29, 2016) (dismissing counterfeit claim because the

defendant's products, which included the defendant's brand name on them, were not identical to or substantially indistinguishable from the plaintiffs products); *Audemars*, 2015 WL 150756, at *2 (no counterfeiting in light of overall appearance, including separate brand names). Further, Lontex did not allege any facts that indicate the accused use "was meant to 'trick the consumer' into believing they were receiving Plaintiff's services when instead they were buying Defendant's 'imitation' services." *Cohen*, 2022 WL 5250271, at *2 (citations omitted). Lontex failed to state a counterfeiting claim for this reason alone.

Nor can the designation "NIKE Pro Cool Compression" be plausibly characterized as "identical with, or substantially indistinguishable from," Lontex's COOL COMPRESSION mark. *See e.g.*, *GMA Accessories, Inc. v. BOP, LLC*, 765 F. Supp. 2d 457, 471-72 (S.D.N.Y. 2011) (accused mark CHARLOTTE SOLNICKI is "simply not identical with or substantially indistinguishable from" plaintiff's CHARLOTTE mark); *Tovey v. NIKE, Inc*., 2013 WL 486341, at *3-4 (N.D. Ohio Feb. 6, 2013) (accused BOOM mark was not identical to or substantially indistinguishable from plaintiff's BOOM YO! mark). As the district court correctly observed, "[t]he addition of 'NIKE PRO' or 'PRO' [is] not a 'minor difference[]' that the average consumer would disregard when comparing marks that are otherwise 'identical' or 'substantially indistinguishable.'" (A65.) This difference alone forecloses Lontex's counterfeiting claims.

Further undermining any counterfeiting theory is Lontex's own allegation that Lontex "has received reports by its professional sports team clients that the Nike's compression products are substantially inferior in performance than Lontex's products." (A219, FAC ¶ 33.) As the district court correctly observed, "the reasonable inference is that customers distinguished between Nike and Lontex's uses of the COOL COMPRESSION mark on compression products." (A67.) This is yet another reason why the FAC cannot support any plausible inference that an "observer seeing Nike's" use of NIKE PRO Cool Compression "would believe it to be Lontex's mark." (A67.)

Lontex wrongly argues that this allegation is "consistent with Lontex's counterfeiting allegations" because it shows that "consumers are upset that Nike is not living up to the quality they expected from clothing having Cool Compression technology." (LB 73-74.) Even if this attorney argument were considered part of the complaint, it still does not suggest any deception as to the origin of the goods or that the heightened level of similarity required for counterfeiting can be met. In fact, Lontex's argument is again self-defeating, as it presupposes that consumers *can and do* distinguish NIKE's goods from Lontex's goods. Lontex's assertion also cannot be reconciled with its concession at oral argument before the district court that it "is only alleging that its customers have said that Nike's 'compression

products in general' are inferior to Lontex's products, not that Nike 'COOL

COMPRESSION' products are inferior."  (A67 n.16.)

Lontex also argues (at 73-74) that its counterfeiting claim was viable

because it alleged that the phrase "NIKE Pro Cool Compression" "leads consumers

to falsely believe that NIKE has obtained permission to use Plaintiff's COOL

COMPRESSION branded technology," or to believe that NIKE "has acquired the

rights to bring Plaintiff's COOL COMPRESSION products in-house and is now

itself selling compression products with Plaintiff's COOL COMPRESSION

technology."  (A218-19, FAC ¶¶ 21-22.)  But the only plausible inference to be

drawn from these allegations is that the consumers knew the product was a NIKE

product, not a Lontex product.  As a matter of law, that is an allegation of ordinary

trademark infringement, not counterfeiting.  Lontex's complaint is thus bereft of

any factual allegations that could plausibly meet the high standard for

counterfeiting.

Even a cursory inspection of the supplemental exhibits that Lontex

submitted to the district court at the pleading stage (ECF No. 34-1) negates the

plausibility of any suggestion that a consumer would have been "trick[ed] . . . into

believing he or she is getting a genuine [Lontex] article." *Coty*, 277 F. Supp. 3d at

468-69 (quotations omitted).  For instance, the NIKE products do not have the

words "cool compression" anywhere on them and are marked clearly with a Nike

SWOOSH, whereas Lontex's products are marked clearly with the Sweat It Out logo:



Other images submitted by Lontex clearly show the words NIKE PRO emblazoned on the waistline of the products and demonstrate unmistakably to the average consumer that these were NIKE PRO garments, not Lontex garments:



As the district court correctly observed, these exhibits "fail to support Lontex's allegations that consumers viewing Nike and Lontex merchandise would perceive Nike's COOL COMPRESSION products to be Lontex's COOL COMPRESSION products." (A70.) Nor would such consumers view these NIKE

catalogues or NIKE garments and believe that NIKE's mark is "identical with, or substantially indistinguishable from" Lontex's mark.

Not all trademark infringement is counterfeiting, which is "the most blatant and egregious form of 'passing off.'" 4 MCCARTHY ON TRADEMARKS § 25:10. Lontex's arguments would obliterate this distinction. The district court correctly dismissed these claims with prejudice at the pleading stage. That ruling should be affirmed.

## V.    CONCLUSION

The district court erred in denying JMOL of no trademark liability. The judgment should be reversed entirely, thus mooting willfulness and remedies. If this Court nonetheless reaches those issues, then willfulness, punitive damages, enhanced damages, and the "exceptional case" fee award should be set aside as legally improper. The district court's dismissal of Lontex's counterfeiting claims and its denial of disgorgement should be affirmed.

Dated:  January 13, 2023                    Respectfully Submitted,

                                            */s/ Ilana H. Eisenstein*
                                            Ilana H. Eisenstein
                                            Ben C. Fabens-Lassen
                                            DLA PIPER LLP (US)
                                            One Liberty Place
                                            1650 Market Street, Suite 5000
                                            Philadelphia, PA 19103-7300
                                            (215) 656-3300

                                            Stanley J. Panikowski
                                            DLA PIPER LLP (US)
                                            401 B Street, Suite 1700
                                            San Diego, CA 92101
                                            (619) 699-2700

                                            Gina L. Durham
                                            DLA PIPER LLP (US)
                                            555 Mission Street, Suite 2400
                                            San Francisco, CA 94105
                                            (415) 836-2500

                                            Marc E. Miller
                                            DLA PIPER LLP (US)
                                            1251 Avenue of the Americas
                                            New York, NY 10020
                                            (212) 335-4500

                                            *Attorneys for Appellant/Cross-*
                                            *Appellee NIKE, Inc.*

# CERTIFICATION OF BAR MEMBERSHIP

Pursuant to Local R. 28.3(d) and Local R. 46.1(e), I hereby certify that I, Ilana

H. Eisenstein, am admitted as an attorney and member in good standing of the bar

of the United States Court of Appeals for the Third Circuit.


Dated:  January 13, 2023                    */s/ Ilana H. Eisenstein*
                                                 Ilana H. Eisenstein
                                                 DLA PIPER LLP (US)
                                                 One Liberty Place
                                                 1650 Market Street, Suite 5000
                                                 Philadelphia, PA 19103-7300
                                                 Tel: 215.656.3300

# CERTIFICATION OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(g) and Local R. 31.1, I certify the following:

1.    This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 12,976 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in Times New Roman 14-point font using Microsoft Word for Microsoft 365.

3.    This brief complies with the electronic filing requirements of Local R. 31.1(c) because the text of the electronic brief is identical to the text in the paper copies and because Windows Defender Antivirus Version 1.1.19600.3 was run on the file containing the electronic version of this brief and no viruses were detected.

Dated:  January 13, 2023

*/s/ Ilana H. Eisenstein*
Ilana H. Eisenstein
DLA PIPER LLP (US)
One Liberty Place
1650 Market Street, Suite 5000
Philadelphia, PA 19103-7300
Tel: 215.656.3300

# CERTIFICATION OF SERVICE

I certify that, on January 13, 2023, I caused this brief to be served on all counsel of record listed on the CM/ECF Service List.

Dated:  January 13, 2023

/s/ Ilana H. Eisenstein
Ilana H. Eisenstein
DLA PIPER LLP (US)
One Liberty Place
1650 Market Street, Suite 5000
Philadelphia, PA 19103-7300
Tel: 215.656.3300