**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

Nos. 22-1417 & 22-1484
_____

LONTEX CORPORATION

v.

NIKE, INC.

> Lontex Corp.,
>> Appellant in No. 22-1484
> Nike, Inc.,
>> Appellant in No. 22-1417

_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 2-18-cv-05623)
Honorable Michael M. Baylson

_____

Argued on January 17, 2024

Before: HARDIMAN, MATEY, and PHIPPS, *Circuit Judges*.

(Filed: July 10, 2024)

Ilana H. Eisenstein
Ben C. Fabens-Lassen
DLA Piper LLP
1650 Market Street
One Liberty Place, Suite 5000
Philadelphia, PA 19103

Michael D. Hynes
Marc E. Miller
DLA Piper LLP
1251 Avenue of the Americas
New York, NY 10020

Stanley J. Panikowski [Argued]
DLA Piper LLP
4365 Executive Drive
Suite 1100
San Diego, California 92121

Gina L. Durham
DLA Piper LLP
555 Mission Street, Suite 2400
San Francisco, California 94105

*Counsel for Appellant*

Craig C. Crockett
Troutman Pepper Hamilton Sanders LLP
3 Embarcadero Center, Suite 800
San Francisco, CA 94111

Michael A. Schwartz
Troutman Pepper Hamilton Sanders LLP

3000 Two Logan Square
Eighteenth & Arch Streets
Philadelphia, PA 19103

Misha Tseytlin [Argued]
Troutman Pepper Hamilton Sanders LLP
227 W. Monroe St., Suite 3900
Chicago, Illinois 60606

Ben L. Wagner
Troutman Pepper Hamilton Sanders LLP
11682 El Camino Real, Suite 400
San Diego, CA 92130

       *Counsel for Appellee*

_____

## OPINION OF THE COURT

_____

HARDIMAN, *Circuit Judge*.

This dispute involves a registered trademark for "Cool Compression." The holder of the mark, Lontex Corporation, is a small Pennsylvania business that manufactures and sells compression apparel to professional athletes and the sporting public. Lontex sued Nike, Inc. for trademark infringement.

After a trial on the merits, the jury awarded Lontex $142,000 in compensatory damages and $365,000 in punitive damages. Both parties appeal multiple issues involving the

jury's findings and the District Court's pre-trial and post-trial orders. We will affirm the District Court on all issues except for its orders awarding attorney's fees to Lontex, which we will vacate and remand for further proceedings consistent with this opinion.

I

A

In 2008, the United States Patent and Trademark Office approved Lontex's application and registered the "Cool Compression" trademark. The mark consisted of "standard characters without claim to any particular font, style, size or color" when used in connection with athletic compression clothing. App. 2597 (capitalization removed). Lontex initially used the phrase "Cool Compression" at in-person product presentations. But after obtaining the trademark, the company started displaying the phrase on its website and printing it on some of its product labels. It sold Cool Compression apparel under the "Sweat it Out" brand to many professional sports teams and the public alike.

In 2015, Nike rebranded a line of its base-layer athletic clothing as "Nike Pro." The rebranding included a category of "Cool" products designed to absorb sweat and reduce body temperature. Nike Pro clothing also came in various fits such as "compression" and "fitted." App. 1151–52, 2366. That same year, Nike started using the words "Cool" and "Compression" together in the names of Nike Pro products that were sold online and in Nike catalogs. "Cool Compression" also appeared in product names on Nike's tech sheets (internal documents used to explain Nike products to Nike employees and some third-

party retail partners). The phrase "Cool Compression" did not appear on Nike's physical products or product tags.

B

After discovering Nike's use of "Cool Compression," Lontex sent Nike a cease-and-desist letter in April 2016, demanding that it stop using the phrase on nike.com and with its distributors. Based on communications with Nike, Lontex's owner believed that Nike might stop using the phrase on nike.com, but the parties did not discuss whether Nike would ask its third-party retailers to remove the phrase from their online listings as well. While third-party retailers often write their own product descriptions for their websites, Nike typically names the products, as retailers are "not expected to come up with their own product name[s]." App. 1211.

After receiving the cease-and-desist letter, Nike's lawyers directed the company to stop using the phrase "Cool Compression" in product names "as soon as possible." App. 2346. Nike's lawyers also assumed that the issue would be resolved in the course of the company's efforts to streamline its naming conventions because Nike planned to start using "tight" instead of "compression." App. 2346, 2402–03.

In the subsequent months, Nike removed the phrase "Cool Compression" from product names on its website and took steps to remove it from its catalogs, though the phrase still appeared in Nike catalogs over a year later. There is no evidence that Nike removed "Cool Compression" from its tech sheets.

About two years after the cease-and-desist letter issued, Nike reached out to all third-party retailers authorized to sell

Nike products online and asked them to stop using "Compression" in product names. In doing so, Nike made no mention of Lontex's cease-and-desist letter and simply presented the change as an update to Nike's product naming convention. At the time, multiple retailers were still marketing products with "Cool Compression" in their names.

As relevant here, Lontex sued Nike for: (1) trademark infringement based on its use of "Cool Compression"; (2) contributory trademark infringement based on Nike's continued supply of "Cool Compression" products to third-party retailers; and (3) counterfeiting. *See Lontex Corp. v. Nike, Inc.*, 384 F. Supp. 3d 546, 551–52 (E.D. Pa. 2019). The District Court dismissed Lontex's counterfeiting allegation under Rule 12(b)(6) of the Federal Rules of Civil Procedure, holding that Nike's use of "Cool Compression" was not "substantially indistinguishable" from Lontex's use of the phrase. *Id.* at 558 (citation omitted).

C

At trial, multiple Nike employees testified that they had never heard of Lontex—much less its trademark—before the company received the cease-and-desist letter. Although it was Nike's policy to submit its product names through a trademark search tool, the company did not conduct a trademark search on "Cool Compression" because employees viewed the phrase as merely a descriptive term for the product style and fit. Nike's Product Line Manager for the Nike Pro line, whose responsibilities included ensuring "compl[iance] with . . . direction from Legal," App. 2323, explained that Nike's lawyers had instructed his team to "separate" the words "Cool" and "Compression" from each other, App. 2322–23. And he viewed compliance with this directive as mandatory.

Lontex customers testified that they associated the phrase "Cool Compression" with Lontex. But some had also seen the phrase used with Nike products. Two customers saw a sign for Nike "Cool Compression" products in a Dick's Sporting Goods store, and two others saw the phrase in Nike catalogs. These four customers wondered whether there was an association between Lontex and Nike, but there is no evidence they ever asked about, or actually bought, a Nike product under the mistaken belief it was a Lontex product.

The jury returned a verdict for Lontex, finding Nike liable for willful infringement and for contributory infringement based on Nike's sales to third-party retailers. As for damages, the parties' testimony varied dramatically. Lontex's expert estimated that the company lost $40 million, while Nike's expert testified that Lontex lost at most $800,000. The jury awarded Lontex $142,000 in compensatory damages for lost royalties and $365,000 in punitive damages, but it declined to award Lontex disgorgement of Nike's profits.

D

Extensive post-trial motions practice followed the verdict. Nike renewed motions it made at trial for judgment as a matter of law on fair use, trademark infringement, contributory trademark infringement, willfulness, and punitive damages. Lontex moved, among other things, for disgorgement of profits and trebling of damages awarded by the jury. The District Court granted Lontex's request for treble damages and increased the compensatory award to $426,000 but denied the parties' other motions. Separately, the District Court awarded Lontex attorney's fees of almost $5 million after finding the case was "exceptional" under the Lanham Act.

Nike appeals the District Court's orders denying its post-trial motions, trebling the damages, and awarding Lontex attorney's fees. Lontex cross-appeals the order denying its post-trial motion for profit disgorgement and the pre-trial order dismissing its counterfeiting allegation.

## II[1]

We exercise plenary review over the District Court's order denying Nike's requests for judgment as a matter of law and its order dismissing Lontex's counterfeiting allegation under Rule 12(b)(6) of the Federal Rules of Civil Procedure. *Jaasma v. Shell Oil Co.*, 412 F.3d 501, 503 (3d Cir. 2005); *Foglia v. Renal Ventures Mgmt., LLC*, 754 F.3d 153, 154 n.1 (3d Cir. 2014). For judgment as a matter of law, "[t]he question is not whether there is literally no evidence supporting" Lontex, *Jaasma*, 412 F.3d at 503 (cleaned up), but whether "a reasonable jury would . . . have a legally sufficient evidentiary basis to find" for Lontex, Fed. R. Civ. P. 50(a). We view the evidence in the light most favorable to the verdict winner (Lontex) and give it the benefit of every reasonable inference. *McDaniels v. Flick*, 59 F.3d 446, 453 (3d Cir. 1995). We thus do not "weigh the evidence, determine the credibility of witnesses, or substitute [our] version of the facts for the jury's version." *Id.* (cleaned up).

We review for abuse of discretion the District Court's orders: trebling damages, *Kars 4 Kids Inc. v. America Can!*, 8 F.4th 209, 223 n.20 (3d Cir. 2021); declining to grant profit disgorgement, *see id.* n.15; and awarding attorney's fees, *see SecuraComm Consulting Inc. v. Securacom Inc.*, 166 F.3d 182,

---

[1] The District Court had jurisdiction under 28 U.S.C. §§ 1331 and 1338(a). We have jurisdiction under 28 U.S.C. § 1291.

190 n.6 (3d Cir. 1999), *abrogation on other grounds recognized by Banjo Buddies, Inc. v. Renosky*, 399 F.3d 168, 171 (3d Cir. 2005).

## III

### A

Nike appeals the jury's finding that its infringement was "willful," arguing that the jury was improperly allowed to infer willfulness solely from Nike's continued use of Lontex's trademark after it received the cease-and-desist letter. Nike is incorrect.[2]

Though "defendants have every right to decline pre-litigation requests without adverse consequences, . . . they must do so in good faith—that is, believing that they have a colorable claim of right to engage in the challenged behavior." *Green v. Fornario*, 486 F.3d 100, 104 (3d Cir. 2007). So continued use of a trademark contrary to a cease-and-desist

---

[2] Nike also argues it was inaccurate to instruct jurors that willfulness "encompasses . . . reckless infringement." Nike Br. 48 (quoting App. 1574–75). Several courts of appeals have recognized willfulness as extending to reckless infringement. *See Fishman Transducers, Inc. v. Paul*, 684 F.3d 187, 191 (1st Cir. 2012); *4 Pillar Dynasty LLC v. N.Y. & Co., Inc.*, 933 F.3d 202, 209–10 (2d Cir. 2019); *Zazú Designs v. L'Oréal, S.A.*, 979 F.2d 499, 507 (7th Cir. 1992). We need not reach this question because Nike challenges the willfulness finding only as a matter of law without appealing the jury instructions themselves or requesting a new trial on that basis. For the same reason, we do not reach Nike's challenge to a reverse confusion instruction.

letter can establish willfulness if done in bad faith. *See id.* at 104–05. A defendant's subjective belief is often discerned through circumstantial, rather than direct, evidence. *See id.* at 104. "When there is no evidence of bad faith in the adoption of the mark, all post-notification conduct must be analyzed to determine if the defendant's continuing actions were unreasonable and amounted to bad faith." *Moore Bus. Forms, Inc. v. Ryu*, 960 F.2d 486, 492 (5th Cir. 1992).

Even assuming that Nike had no improper motive in adopting the phrase "Cool Compression" without conducting a trademark search, a jury could still find willfulness from Nike's continued use after it learned of Lontex's trademark. After reviewing the cease-and-desist letter, Nike's legal department instructed the company to stop using "Cool Compression" "as soon as possible." App. 2346. That advice might have been precautionary guidance designed to avoid litigation notwithstanding Nike's belief that it had a colorable legal basis to use the phrase. Or perhaps Nike needed to stop "as soon as possible" because the company knew it was infringing Lontex's trademark rights. The evidence does not compel one inference over the other, so a reasonable jury *could have found* that Nike did not subjectively believe it had a right to use "Cool Compression" in view of its counsel's legal advice.

Despite that advice, Nike kept using the mark for at least a year in its catalogs. And there is no evidence that Nike removed the phrase from the tech sheets viewed by sales associates and some retailers. Nor is there any evidence that the company alerted third-party retailers of the trademark issue as Nike continued to sell them "Cool Compression" products for two years. Taken together, this circumstantial evidence supports a jury inference that Nike, despite knowing of

Lontex's trademark and being advised by its own lawyers to stop using the mark, intentionally continued using Lontex's trademark. Because a reasonable jury could find that Nike's continued use of Lontex's trademark shows willful infringement, the District Court did not err, and Nike is not entitled to judgment as a matter of law.

## B

Nike next argues that its incorporation of "Cool Compression" in product names was fair use, meaning that Nike used the words "fairly and in good faith only to describe" its products without presenting the phrase as a trademark. 15 U.S.C. § 1115(b)(4). This argument fails for the same reasons that a jury could find Nike's continued use of the phrase against the advice of its own lawyers was willful and not in good faith. Because a reasonable jury could reject Nike's fair use defense, the District Court did not err, and Nike is not entitled to judgment as a matter of law. *See Inst. for Sci. Info., Inc. v. Gordon & Breach, Sci. Publishers, Inc.*, 931 F.2d 1002, 1008 (3d Cir. 1991).

## C

Nike also claims entitlement to judgment as a matter of law on the likelihood of consumer confusion. We assess that issue by balancing the ten *Lapp* factors, none of which is dispositive. *Checkpoint Sys., Inc. v. Check Point Software Techs., Inc.*, 269 F.3d 270, 280 (3d Cir. 2001); s*ee also Interpace Corp. v. Lapp, Inc.*, 721 F.2d 460 (3d Cir. 1983).

### 1. *Factor One: Degree of Similarity Between Marks*

Assessing the degree of similarity requires us to determine whether two marks "create the same overall impression when viewed separately." *Checkpoint*, 269 F.3d at 281 (cleaned up). We consider whether the "average consumer, on encountering one mark in isolated circumstances of [the] marketplace and having only a general recollection of the other, would likely confuse or associate the two." *Id.* (cleaned up). Lontex used "Cool Compression" as a standalone mark, while Nike used it only as part of longer product names containing additional Nike branding. Even so, both companies used the same alliterative phrase, which would likely create a similar "overall impression" for a consumer with "only a general recollection" of the marks. *Id.* (cleaned up). So we conclude that a jury could find that this similarity increased the likelihood of confusion.

### 2. *Factor Two: Strength of the Owner's Mark*

"The strength of a mark is determined by (1) the distinctiveness or conceptual strength of the mark and (2) its commercial strength or marketplace recognition." *Id*. at 282. "Cool Compression" is conceptually weak because both words are at least partially descriptive of the products, *see id.*, and Lontex has no trademark rights over the word "compression." But Lontex presented evidence that its customers associated "Cool Compression" with Lontex products, so a jury could find that this constituted marketplace recognition and increased the likelihood of confusion.

### 3. Factor Three: Price and Purchaser Care and Attention

"When consumers exercise heightened care in evaluating the relevant products before making purchas[es]" it tends to reduce the likelihood of confusion. *Id.* at 284. The more expensive and "more important the use of a product," the more care consumers exercise. *Versa Prods. Co. v. Bifold Co. (Mfg.)*, 50 F.3d 189, 204 (3d Cir. 1995). Similarly, professional purchasers tend to exercise more care than ordinary consumers. *See Checkpoint*, 269 F.3d at 285. Although Nike and Lontex sold products to professional sports teams, which likely exercised heightened care, they also sold athletic apparel to ordinary customers. And because ordinary customers tend to exercise limited care and attention, a jury could find that this factor increased the likelihood of confusion.

### 4. Factors Four and Six: Length of Nike's Use Without Evidence of Actual Confusion; and Evidence of Actual Confusion

Actual consumer confusion is strong evidence of a likelihood of confusion. *Fisons Horticulture, Inc. v. Vigoro Indus., Inc.*, 30 F.3d 466, 476 (3d Cir. 1994). Confusion is not limited solely to mistaken purchasing decisions, *see Checkpoint*, 269 F.3d at 294–95, but "[w]here confusion has little or no meaningful effect in the marketplace [itself], it is of little or no consequence in our analysis," *id.* at 297. In *Checkpoint*, for instance, we noted that "anecdotal evidence of mistaken consumer inquiries" constituted only "de minimis" evidence of confusion. *Id.* at 298–99. This case exemplifies that point. A few Lontex customers expressed uncertainty over a possible association between Nike and Lontex, but that uncertainty had no appreciable effect on their interactions with

the companies. And without actual confusion, the length of Nike's use does not weigh in Lontex's favor either. So a jury could not reasonably find that these two factors increased the likelihood of confusion.

### 5. *Factor Five: Nike's Intent in Adopting the Mark*

Confusion is more likely where "the defendant chose the mark to intentionally confuse consumers," as "demonstrated via purposeful manipulation of [the defendant's] mark to resemble the [plaintiff's]." *Sabinsa Corp. v. Creative Compounds, LLC*, 609 F.3d 175, 187 (3d Cir. 2010) (cleaned up). "The adequacy and care with which a defendant investigates and evaluates its proposed mark, and its knowledge of similar marks" are also "highly relevant." *Kos Pharms., Inc. v. Andrx Corp.*, 369 F.3d 700, 721 (3d Cir. 2004) (citations omitted). When assessing the defendant's behavior, we look for evidence of deliberate intent, not mere carelessness. *See A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 237 F.3d 198, 232–33 (3d Cir. 2000).

The District Court concluded that "a reasonable jury might find that Nike acted with reckless indifference" by failing to conduct a trademark search and continuing to use the phrase after learning of Lontex's trademark. *Lontex Corp. v. Nike, Inc.*, 2022 WL 622321, at *9 (E.D. Pa. Mar. 3, 2022). We see it differently. On this record, it is hard to see how a jury could find deliberate intent.

Failure to conduct a trademark search can demonstrate intent in some situations, such as where the defendant has preexisting knowledge of the plaintiff's mark or disregards counsel's advice to conduct a trademark search. *See SecuraComm*, 166 F.3d at 188–89 (citations omitted). But

failure to conduct a trademark search out of mere "carelessness is not the same as deliberate indifference with respect to another's rights in a mark or a calculated attempt to benefit from another's goodwill." *Id.* at 189.

We find it significant that Lontex did not challenge the testimony from Nike employees that they were unaware of Lontex and its trademark prior to this dispute. And though Nike had a general policy requiring trademark searches, the record contains no evidence that Nike's lawyers advised it to run a trademark search on "Cool Compression" prior to using the phrase. So while Nike may have been careless in failing to conduct a trademark search, its carelessness does not reveal a deliberate intent to capitalize on Lontex's trademark. *See id.* at 189.

Finally, to state the obvious, if Nike was unaware of Lontex, it could not have adopted "Cool Compression" with the deliberate intent to imitate Lontex and confuse consumers. And Nike's continued use *after* adopting the phrase and learning of Lontex's trademark does not shed light on the company's initial intent. A jury would thus have insufficient evidence to find that Nike adopted the mark with the intention of confusing consumers.

### 6. Factors Seven, Eight, and Ten: Similarity of Marketing Channels; Target Markets; and Actual Sales Markets

"[S]imilarity in advertising and marketing campaigns" directed at "the same consumers" increases the likelihood of confusion. *Checkpoint*, 269 F.3d at 288–89 (citation omitted). But "[g]oods may fall under the same general product category [yet] operate in distinct niches." *Id.* at 288. Nike seeks to

differentiate its sales market and advertising by pointing to Lontex's focus on sports medicine. But as the District Court found, both companies advertised their products as improving athletic performance, so their marketing strategies overlapped in at least some areas. And the companies marketed and sold to the same professional sports teams, creating overlap in their target and actual sales markets. Though both also marketed and sold their products to ordinary consumers, they did so through separate channels. Unlike Nike, Lontex advertised to consumers primarily through its owner's presentations at in-person events. And unlike Lontex, Nike sold products to regular consumers through brick-and-mortar stores and independent retailers. So while the parties' sales and marketing to ordinary consumers bore little similarity, a jury could find that the overlap in marketing and sales to professional sports teams increased the likelihood of confusion.

### 7. *Factor Nine: Relationship of the Goods in the Minds of Consumers*

Confusion is more likely when "goods are similar enough that a customer would assume they were offered by the same source" or shared a "common source affiliation or sponsorship." *Id.* at 286. The products here are similar because both companies made and sold compression apparel. This is considerably more similar than other products we have regarded as such. *See, e.g.*, *Fisons*, 30 F.3d at 481 (listing cases in which courts found similarities between products including "pipe tobacco and bar accessories with scotch whisky" and "women's scarves and apparel with women's cosmetics and fragrances"). Because both companies sold athletic compression apparel, a jury could find the relationship of the goods in the minds of consumers increased the likelihood of confusion.

\*   \*   \*

Our review of the *Lapp* factors leads us to conclude that they do not strongly support either party. But reviewing the evidence in the light most favorable to the verdict winner—here, Lontex—we hold that a reasonable jury could find that seven out of the ten factors increased the likelihood of confusion. This suffices to establish a likelihood of confusion, so Nike is not entitled to judgment as a matter of law. [3]

D

A company can be liable for trademark infringement by an independent retailer if the company "continues to supply its product to one whom it knows or has reason to know is engaging in trademark infringement." *Inwood Labs, Inc. v. Ives Labs, Inc.*, 456 U.S. 844, 854 (1982); *see also AT&T Co. v. Winback & Conserve Program, Inc.*, 42 F.3d 1421, 1432 (3d Cir. 1994). While its third-party retailers often crafted their

---

[3] Lontex and Nike also discuss reverse confusion, which is another way to establish a likelihood of confusion. *See Freedom Card, Inc. v. JPMorgan Chase & Co.*, 432 F.3d 463, 470 (3d Cir. 2005). "Reverse confusion is the misimpression that the junior user is the source of the senior user's goods." *Banff, Ltd. v. Federated Dep't. Stores, Inc.*, 841 F.2d 486, 490 (2d Cir. 1988). Reverse confusion implicates the *Lapp* factors, but requires modified consideration of factors two, five, and six. *See Freedom Card*, 432 F.3d at 472. Lontex had to show either direct confusion *or* reverse confusion to prevail. Because the jury had enough evidence to find for Lontex based on direct confusion, Nike was not entitled to judgment as a matter of law and we need not reach reverse confusion.

own product descriptions, Nike knew that they typically copied Nike's product names when selling its apparel. Yet Nike kept selling to these retailers for two years after Lontex put Nike on notice of a possible trademark violation and Nike's own lawyers advised the company to stop using "Cool Compression." And Nike did not inform its retailers about Lontex's cease-and-desist letter or the potential legal ramifications of using the phrase. This evidence is sufficient for a jury to find Nike liable for contributory infringement, so the District Court did not err in so holding.

E

Nike challenges the availability of punitive damages under Pennsylvania law. Pennsylvania follows the *Restatement (Second) of Torts*, allowing punitive damages only "for conduct that is outrageous, because of the defendant's evil motive or his reckless indifference to the rights of others." *Feld v. Merriam*, 485 A.2d 742, 747 (Pa. 1984) (cleaned up). Both "willful" and "reckless" conduct qualify as outrageous. *Id.* at 747–48. As the District Court correctly concluded, the evidence that supports a jury finding of willfulness under the Lanham Act also supports a jury finding that Nike acted with reckless indifference under Pennsylvania law. Specifically, Nike kept using "Cool Compression" after its own lawyers reviewed Lontex's cease-and-desist letter and instructed Nike to stop using Lontex's trademark. Thus, Nike is not entitled to judgment as a matter of law and the District Court did not err.

F

The Lanham Act allows a court to enter an award of up to three times "the amount found as actual damages" if such enhancement is warranted "according to the circumstances of

the case." 15 U.S.C. § 1117(a). Willfulness plays a "central" role in enhancing damages, *Kars 4 Kids*, 8 F.4th at 224 n.22, but enhancements must be awarded for compensatory, not punitive, reasons, *see id.* at 225.

Nike argues the District Court relied solely on impermissible punitive justifications to treble the jury's compensatory damages award from $142,000 to $426,000. The record shows otherwise. The District Court explained it was trebling damages "principally because of the [jury's] finding of willfulness." *Lontex*, 2022 WL 622321, at *5. The Court also considered its separate decision to reject Lontex's request for profit disgorgement, which would have significantly increased Lontex's compensation because Nike's estimated profits "greatly exceed[ed] the compensatory damages." *Id.* Instead, the District Court exercised its discretion to "provide adequate compensation" to Lontex through a damages enhancement. *Id.*

It is true, as Nike argues, that the District Court discussed the "David and Goliath" nature of the case, the fact that "Nike substantially profited from the sale of trademark infringing products," and the importance of "'making infringement unprofitable.'" *Id.* (quoting *Banjo Buddies*, 399 F.3d at 178). But even assuming these considerations were impermissible, the District Court's principal reasons were proper and independently sufficient to support the damages enhancement. *See Gen. Motors Corp. v. New A.C. Chevrolet, Inc.*, 263 F.3d 296, 329 (3d Cir. 2001). So we hold the District Court did not abuse its discretion in trebling damages.

G

Nike also appeals the District Court's award of attorney's fees to Lontex. Fees should be awarded in the trademark infringement context only if the case is "exceptional," *Fair Wind Sailing, Inc. v. Dempster*, 764 F.3d 303, 314–15 (3d Cir. 2014), meaning it "stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated," *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 554 (2014). "There is no precise rule or formula for making these determinations," and courts should "consider[] the totality of the circumstances." *Id.* (cleaned up).

The District Court stated three reasons for finding this case exceptional, each of which is rooted in broad policy considerations rather than facts specific to this case.

First, the Court reasoned that enforcement of trademark laws is important. *Lontex Corp. v. Nike, Inc.*, 2022 WL 815800, at *1 (E.D. Pa. Mar. 17, 2022). We agree, but that truism does nothing to distinguish this case from any other trademark case.

Second, the District Court noted that Lontex is a small company that took on "a major United States corporation with much larger resources" in a "daunting" "David and Goliath" matchup. *Id.* The size of companies may inform whether one party engaged in unfair litigation tactics, such as when a larger party seeks to "bury" a smaller opponent financially or "prevail by crushing" it. *Securacomm Consulting, Inc. v. Securacom Inc.*, 224 F.3d 273, 282 (3d Cir. 2000) (internal quotations marks omitted). But the District Court found that Nike did *not* "engage[] in any unfair, improper litigating strategy or . . .

litigate[] this case in a[n] 'unreasonable manner.'" *Lontex*, 2022 WL 815800, at *2. On these facts, the parties' respective sizes and resources, without more, are not relevant considerations for exceptionality.

Finally, the Court found that trademark cases are expensive to litigate and that, "as a matter of policy," "[i]t is not realistic to expect a small [company] like Lontex to be able to pay the legal bills to a major law firm[] for this type of case." *Id.* Here again, such costs are typical of trademark infringement cases. Moreover, Lontex's privilege logs suggest the company may have received outside litigation funding. If the District Court concludes on remand that Lontex's ability to pay its legal fees is relevant, the Court's reasoning must be based on the facts of this case rather than broad policy considerations.

The District Court also found that "Lontex showed 'substantive strength'" in its case but did not provide any explanation for this conclusion. *Id.* Lontex's victory on the merits of a hard-fought case does not, by itself, render its position "exceptional"—especially since the jury largely rejected Lontex's damages claims. If the District Court finds on remand that Lontex showed substantive strength, the Court should explain how it reached this conclusion under "both the governing law and the facts of the case." *Octane Fitness*, 572 U.S. at 554.

While discussing the "David and Goliath" aspect of the case, the District Court noted that willfulness was "an important factor" in its exceptionality determination. *Lontex*, 2022 WL 815800, at *1. But willfulness was not one of the three reasons the Court gave for its decision, and one passing reference to it is insufficient for us to conclude that "it is highly

probable" the Court would have found exceptionality absent improper considerations. *New A.C. Chevrolet,* 263 F.3d at 329. Consequently, the District Court's brief mention of substantive strength and willfulness does not render the previous considerations harmless error. *See id.*

On remand, the District Court should apply *Octane Fitness* and *Fair Wind Sailing*. The District Court has broad discretion and may look to the totality of the circumstances when assessing exceptionality, but the Court should not rely on general policy considerations that apply in typical trademark infringement cases. And while the behavior of the parties during litigation may be relevant, the Court should avoid extralegal assessment of the parties' sizes and financial resources as standalone indicators of exceptionality.

*        *        *

To sum up: Nike is not entitled to judgment as a matter of law on any of the jury's findings and the District Court did not abuse its discretion by trebling damages. For the reasons stated, however, we will vacate the orders awarding Lontex attorney's fees and remand for the District Court to reassess whether the case is exceptional.

## IV

We turn last to the cross-appeal. Lontex challenges the District Court's order dismissing its counterfeiting allegation prior to trial and the Court's order refusing to award disgorgement of Nike's profits.

A

The District Court properly dismissed Lontex's counterfeiting allegation[4] under Rule 12(b)(6) of the Federal Rules of Civil Procedure. For a complaint to state a claim upon which relief may be granted, a plaintiff must "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Under the Lanham Act, a "counterfeit" is "a spurious mark which is *identical with, or substantially indistinguishable from*, a registered mark." 15 U.S.C. § 1127 (emphasis added). This is a higher standard than other forms of trademark infringement, such as a "colorable imitation" which "includes any mark which so resembles a registered mark as to be likely to cause confusion or mistake or to deceive." *Id.* So counterfeiting requires greater similarity between marks than other types of trademark infringement.

As the Eighth Circuit explained, "[a] counterfeit is . . . far more similar to the registered mark than a mark that barely infringes it, and so an infringing mark is not necessarily also a counterfeit." *Sturgis Motorcycle Rally, Inc. v. Rushmore Photo & Gifts, Inc.*, 908 F.3d 313, 340 (8th Cir. 2018); *see also* 3 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 25:15.50 (5th ed.) ("The test of 'identical with, or substantially indistinguishable from' requires a much closer degree of similarity than is required for traditional infringement of a registered trademark.") (collecting district

---

[4] Lontex argued before the District Court that counterfeiting was a basis for additional statutory damages rather than a standalone claim. *See Lontex*, 384 F. Supp. 3d at 552.

court cases). Other circuit courts have arrived at similar conclusions when interpreting the Lanham Act in criminal rather than civil contexts. *See Sakar Int'l, Inc. v. United States*, 516 F.3d 1340, 1346 n.5 (Fed. Cir. 2008) ("Merchandise bearing a 'counterfeit mark' is . . . a subset of merchandise that merely 'copies or simulates' a registered mark."); *Montres Rolex, S.A. v. Snyder*, 718 F.2d 524, 528 (2d Cir. 1983) (distinguishing between "mere[] infringements" and marks that "not only infringe but in addition are such close copies that they amount to counterfeits").

We measure the similarity of two marks by comparing the "overall impression" ordinary consumers would have upon encountering the marks. *See Fisons*, 30 F.3d at 477. A trademark, after all, derives its "commercial impression" from its appearance "as a whole, not from its elements separated and considered in detail." *Est. of P.D. Beckwith, Inc., v. Comm'r of Pats.*, 252 U.S. 538, 545–46 (1920). Put simply, if consumers see "the entirety of the marks," "it is the entirety of the marks that must be compared." *Opryland USA Inc. v. Great Am. Music Show, Inc.*, 970 F.2d 847, 851 (Fed. Cir. 1992).

In this case, an ordinary consumer viewing the entirety of the "Cool Compression" marks used by Nike and Lontex would not find the marks "identical" or "substantially indistinguishable." 15 U.S.C. § 1127. Nike used "Cool Compression" as a part of longer product names, and each of those product names *also* contained a Nike brand identifier such as "Nike Pro" or "Air Jordan" immediately before the trademarked phrase. So consumers saw Nike's use of "Cool Compression" in the context of Nike's iconic brands. In contrast, Lontex did not include Nike branding alongside its trademark. This difference distinguishes the marks even more for counterfeiting purposes.

We hold that the marks were similar enough to constitute general trademark infringement but not "substantially indistinguishable." So Lontex's counterfeiting allegation was not plausible and the District Court correctly dismissed it.

B

Lontex next argues that the District Court failed to assess whether Lontex is entitled to disgorgement of Nike's profits and instead simply acquiesced to an advisory jury verdict. This claim is unpersuasive because the District Court independently analyzed disgorgement and, in its discretion, decided against awarding that remedy. *See Lontex*, 2022 WL 622321, at *3–5.

Profit disgorgement "does not follow as a matter of course upon the mere showing of an infringement." *A & H Sportswear*, 166 F.3d 197, 209 (3d Cir. 1999) (citation omitted). Decisions on equitable remedies "must be made on a case-by-case basis." *Holland v. Florida*, 560 U.S. 631, 649–50 (2010) (cleaned up). Courts decide the propriety of disgorgement by considering six non-exclusive factors. *See Banjo Buddies*, 399 F.3d at 175. The District Court did just that and we perceive no abuse of discretion in its analysis.

The Court found that three *Banjo Buddies* factors supported disgorgement and three did not. Balancing these factors, it concluded that "on the whole, the *Banjo Buddies* factors favor non-disgorgement," and that Lontex's request was "not supported by enough evidence or any precedent." *Lontex*, 2022 WL 622321, at *4.

Lontex disagrees with the District Court's assessment and weighing of the factors. But absent a showing that the District Court legally erred in its analysis, "[a] discretionary award is just that—discretionary." *Badger Meter, Inc. v. Grinnell Corp.*, 13 F.3d 1145, 1158 (7th Cir. 1994). Lontex identifies no legal errors and thus has not shown the District Court abused its discretion by declining to award profit disgorgement.

\*    \*    \*

The parties to this trademark infringement dispute received a fair trial and the District Court ably decided the many legal issues presented to it. We will affirm all the orders of the District Court except its orders awarding attorney's fees. We will vacate those orders and remand for further proceedings consistent with this opinion.